[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 930 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 931 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 932 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 933 
The relators, Sidney DeArmas and Edgar H. Powell, are before this Court, asking that it invoke its supervisory jurisdiction by granting writs of certiorari, prohibition and mandamus against the respondent District Judge, who they claim has arbitrarily removed them as grand jurors, without legal cause.
Relators allege that on September 5, 1939, they were duly sworn and qualified by Honorable George P. Platt, Judge of Section "B", of the Criminal District *Page 934 
Court for the Parish of Orleans, as members of the Orleans Parish Grand Jury; that they regularly attended the meetings and took part in the deliberations of the Grand Jury until October 6, 1939, when "certain matters came to the attention of petitioners, which matters led petitioners and at least five other members of the said Grand Jury to question the motives and propriety of the conduct of the District Attorney of Orleans Parish, one Charles A. Byrne, and led petitioners and at least five other members of said Grand Jury to believe that they could not properly perform their duties as grand jurors pursuant to law and their oath of office as long as said Byrne and his assistants continued to act as their sole legal advisors"; that "on October 6, 1939, petitioners, together with the remaining ten members of the Grand Jury, were called into private consultation by Honorable George P. Platt, and, with the admonition of secrecy under their oath, were given certain instructions as to the mode of their procedure, the conduct of their hearings, and the scope of their administrative powers, and the extent of the control of the District Attorney over the members of the Grand Jury and their proceedings"; that "petitioners, realizing the solemnity of their oath and out of an abundance of caution, refrain from divulging what transpired at the aforesaid meeting," but, believing that the said information should be placed before this Court and that the pledge of secrecy does not here apply, they have given the Court the information; that petitioners believe that the instructions given to them on October 6, 1939 "were wholly in excess of the *Page 935 
said court's powers and rights, that said instructions were erroneous and that said instructions had the effect of unlawfully curtailing and bridling the investigatory powers of the Grand Jury, which said grand jurors are charged to exercise, all of which intimidated and confused petitioners and shattered their faith in the efficacy of the court's instructions"; that "on October 9, 1939, petitioners, while endeavoring to carry out their duties as grand jurors, attempted, in open court, to read a request for assistance signed by a majority of the members of the Grand Jury and addressed to the aforesaid court, asking that the said court recuse the District Attorney for the Parish of Orleans, one Charles A. Byrne, and said Byrne's entire legal staff as the sole advisors to the aforesaid Grand Jury, and order said Byrne and his staff to recuse themselves as sole legal advisors to the aforesaid Grand Jury, a copy of which said request being attached hereto and made a part hereof"; that because of what transpired on October 6, 1939, as above set forth, and "in view of the importance of the document to be presented," petitioner Powell was authorized by a majority of the members of the Grand Jury to proceed according to the statutory mandate set forth in Article 196 of the Louisiana Code of Criminal Procedure, which reads: "* * * and such Grand Jury shall make all of its findings and returns in open court to said judge; * * *." That Powell was instructed by the signers of the document to read it in open court, rather than in chambers, the majority of the grand jurors "fearing a repetition of the order *Page 936 
of secrecy attendant to the previous private consultation with said judge"; that, "as the representative of a majority of the members of the Grand Jury, petitioner Powell requested said court for permission to read the document, and Judge Platt refused said request and ordered that the document be submitted to him in private"; that Powell, believing he was performing his duties as a grand juror under Article 196 of the Louisiana Code of Criminal Procedure, began reading the document in open court, whereupon Judge Platt ordered his arrest; that when Powell was seized by the order of Judge Platt, he passed the document to petitioner DeArmas, who was likewise ordered arrested by the Judge, despite the fact that petitioner DeArmas at no time read any part of said document aloud in open court; that "one hour later Judge Platt, in open court, held petitioners to have been in contempt of court and announced their sentence to be the one hour that they had previously been detained"; that "immediately thereafter, said Judge Platt orally attempted to discharge petitioners from their duties as grand jurors, giving as his oral reasons a statement substantially to the effect that said Judge Platt did not believe petitioners capable of performing their duties as grand jurors properly"; that the said Judge did not advise petitioners, or any other members of the Grand Jury, or in any way indicate that the document might be publicly read in open court and conveyed the impression to petitioners that he had denied them the right to publicize the document, especially in view of the events of October 6, 1939, referred to above; that on October 10, *Page 937 
1939, petitioners presented a motion, praying that the court rescind and set aside the order of discharge rendered by Judge Platt, which motion was denied for the reasons assigned in a written opinion by the District Judge, a copy of which is attached to and made a part of the application; that petitioners are informed that Judge Platt intends to have two new members appointed to the Orleans Parish Grand Jury to replace them; that petitioners believed that the only proper course open to them in the conscientious performance of their duties in the interest of the public, pursuant to their oath of office, was to present the document, and they were not motivated by any disrespect for the orderly enforcement of the law or by any attack on the dignity of the court; that "petitioners further aver and contend that under the facts before this Court, said Honorable George P. Platt had no power, authority or right to discharge petitioners as grand jurors and said order of discharge should be annulled, revoked, rescinded and set aside as null, void and of no effect"; and that petitioners further allege and contend, in the alternative, that if Judge Platt had the power to exercise such discretion in discharging them, he arbitrarily and without sufficient cause abused his discretion and that, therefore, his order should be annulled, revoked, rescinded and set aside as erroneous.
The controversial document reads, as follows:
 "Request to the Honorable Judge Platt for Assistance.
"Whereas we, the undersigned members of the Grand Jury for the Parish of Orleans, *Page 938 
have solemnly sworn to the oath of our office as prescribed by law that we `will diligently inquire and true presentment make of such matters and things as shall be given to the Grand Jurors in charge, or otherwise come to (their) knowledge,' and have moreover been charged and instructed by this Honorable Court and are obliged by law to `inquire into all crimes punishable with capital punishment and into all other crimes triable within the Parish,' and
"Whereas we, the undersigned members of the Grand Jury for the Parish of Orleans, are deeply sensible of our duties as members of the Grand Jury, and are sincere in our desire to discharge our obligations as Grand Jurors to the law, to the community, and to this Honorable Court, as well as to the democratic system of which it is a basic part, and
"Whereas, there has come to our knowledge as Grand Jurors numerous instances of scandalous frauds and violations of the laws of the State of Louisiana which this Grand Jury is obliged under law and according to our oath diligently to inquire into, But:
"Whereas, the District Attorney for the Parish of Orleans and his staff of Assistant District Attorneys, are constituted the legal advisors of the Grand Jury, nevertheless the said District Attorney and his staff have failed and refused to cooperate with your Grand Jury to the extent necessary to aid and advise it in its inquiry into the numerous and scandalous and often intricate violations of the criminal laws in this City and Parish. He has permitted *Page 939 
witnesses whose presence was required before the Grand Jury and who were available for questioning to leave the jurisdiction of the Court without serving them with summons to appear; He has refused to summons a witness whose presence was ordered before the Grand Jury upon the ground that the witness was mentally unstable, thus usurping the function of the Grand Jury to determine the credibility of witnesses before it; he has delayed, stalled, and refused to produce and to order the production of books, records, papers, documents and pay rolls on the ground of inconvenience, or that the task is burdensome or tedious, and when the insistence of the Grand Jury for such documents and records finally required the District Attorney's office to accede to its demands, the District Attorney's office, while seeming to cooperate, notified the newspapers of the City of New Orleans of the subject matter under inquiry by the Grand Jury, thus notifying prospective witnesses and suspects of the nature of the inquiry and giving them an opportunity to flee the jurisdiction if they so desire and rendering the task of the Grand Jury more burdensome, besides violating their oath of office and the secrecy of the Grand Jury investigations; He has withheld advice on questions propounded to him by the Grand Jury, or evaded answering the same; he has insulated witnesses from the Grand Jury by questioning them before their appearance in the Grand Jury Room, and thus deprived the Grand Jury of using the element of surprise in obtaining information from them; and, *Page 940 
"Whereas, in the above ways and in other ways, the said District Attorney for the Parish of Orleans, and his staff, have shown a disposition not to cooperate with this Grand Jury, and to frustrate your Grand Jury in the investigation of the widespread frauds and violations of the criminal laws of the State of Louisiana, and
"Whereas, such non-cooperation from within by the legal advisors of your Grand Jury is disheartening and has a demoralizing effect upon men conscientious in their efforts to fulfill their duties as Grand Jurors, a simultaneous and concerted effort from without and designed further to demoralize your Grand Jurors is in progress and has deterred your Grand Jury in the diligent performance of its duty which is evidenced by anonymous telephone calls to several of the members advising and insisting that they `go along with the District Attorney' or `follow the advice of the District Attorney,' and in numerous other ways, including calls by parties purporting to be politically influential upon the employers of certain of your Grand Jurors and exerting pressure upon these employers to instruct their Grand Juror employee to follow the course of conduct prescribed by the District Attorney regardless of his own judgment and conviction in the matter; and
"Whereas, it is inevitable that the Grand Jury cannot adequately and impartially inquire into the numerous violations of the criminal laws of the State of Louisiana committed in this Parish without investigating the affairs of a number of the *Page 941 
associates of the District Attorney and his staff, which will be seriously embarrassing to them and cause them to have a personal interest in such inquiries adverse to the State — the nature of which inquiries cannot be disclosed without violating our oath; and
"Whereas, the Grand Jury believes that it cannot perform the duties imposed upon it by law and by their oath of office if the present District Attorney and his present legal staff are permitted to continue as their only legal advisors, and unless greater investigatorial facilities are provided for your Grand Jury;
"Therefore, be it resolved, by the undersigned members of the Orleans Parish Grand Jury, that we do hereby petition the Honorable George P. Platt, Judge of the Criminal District Court of the Parish of Orleans, who is vested with supervisory jurisdiction and authority over the activities of the Orleans Parish Grand Jury, to recuse the present District Attorney of the Parish of Orleans and his entire legal staff as the sole legal advisors to your Grand Jury, and order them to recuse themselves as sole legal advisors to your Grand Jury.
"Be it further resolved, that the Honorable George P. Platt, Judge of the Criminal District Court for the Parish of Orleans, be respectfully requested to take the proper steps to make available to the Orleans Parish Grand Jury a fund such as was made available to the Baton Rouge Grand Jury, for investigational purposes, and in the sum of, say, Ten Thousand Dollars.
"Be it further resolved, that the Honorable George P. Platt, Judge of the Criminal *Page 942 
District Court for the Parish of Orleans, be further petitioned to appoint one of the following list of Attorneys, with whom your Grand Jury believes it can fully cooperate and who your Grand Jury believes will advise it impartially and without fear or favor, as Special District Attorney and advisor to your Grand Jury, with power to appoint what assistants he may need to investigate and prosecute the numerous and scandalous violations of the criminal laws.
"James W. Hopkins
John E. Jackson
James J. Morrison
J. Bernard Cocke
Burt W. Henry
Azzo Plough
Hugh McCloskey
"All the foregoing the undersigned members of your Grand Jury respectfully submit to the Court.
"(Signed) Edgar H. Powell
" Sidney de Armas
" Waldo Utley
" Hugh C. Quarles
" C.M. Hausknecht
" Louis G. Bellot
" Homer Davis."
Annexed to the application for the writs are several affidavits describing what happened in the court room. From petitioners' affidavits, it appears that upon the request of the five jurors, who signed the document, the foreman of Grand Jury, R.M. Salvant, stated to the respondent, in chambers, that some of the members of the Grand Jury wished to speak to him in open court; that Judge Platt immediately ascended the bench and upon Powell apprising him that he had *Page 943 
a written request to make, Judge Platt stated that he would not permit the reading of the document in open court unless he had first seen it. Powell stated that the document was of such public importance as to necessitate its reading in open court. The District Judge again admonished Powell that he would not permit the reading of the document in court until he had first perused it, and warned him, should he attempt to do so, he would be in contempt of court. Powell stated that he might be in contempt of court, but he was going to read the document anyway, and when he began to read it, Judge Platt ordered the sheriff to arrest him. Powell then handed the document to DeArmas, who also attempted to read it and the District Judge likewise ordered his arrest. DeArmas crumpled the document and threw it away and Judge Platt had it retrieved. The affiant further stated that the District Judge did not at any time say that, after he read the document and found it unobjectionable, he would permit the grand jurors to read it in open court.
Judge Platt, in his reasons for refusing to reinstate the two grand jurors and dismissing their rule filed for that purpose, states the facts of the case substantially the same as those contained in the affidavits of the petitioners, which were filed with their application. He points out that, having no knowledge whatsoever of the contents of the document, his request to see it before permitting it to be read in open court was in compliance with his duty under the law "to see to it that neither the Grand Jury nor any member thereof *Page 944 
makes public any matter that the Grand Jury is bound, as a matter of law, to keep secret." He states, he informed Powell that, if the document did not contain matters which the Grand Jury should keep secret under the law, he would permit the reading of it in open court, but that Powell, after being twice ordered not to read it without first letting him examine the document, began reading it aloud, and upon his arrest, handed it to DeArmas; and that DeArmas started to read it aloud, and when ordered arrested, he then threw the document and it fell into the hands of one of the Assistant District Attorneys. The District Judge says that he was simply requesting an opportunity to acquaint himself with the contents of the document, before either sanctioning or disapproving of the reading thereof, and that he could not condone the defiance of the court's authority by these two grand jurors and was forced to act for the preservation of the order, the respect and the dignity of the law and the court. He states "that there is no requisite more fundamental for proper Grand Jury service than a respect for the authority of the court which empanels the grand jurors, and any official conduct as a grand juror which demonstrates openly and unequivocally, as the conduct of Powell and DeArmas demonstrated their defiance of the authority of this court, is proper and sufficient grounds for the discharge of said parties from service as grand jurors."
In accordance with Rule XIII of this Court, the respondent District Judge requested an opportunity to file a return in opposition to the application for the issuance *Page 945 
of the writs. This request was granted and respondent filed an answer to the relators' petition, denying that he did or said anything which could be construed as a refusal to allow the reading of the request of some members of the Grand Jury, and states that he merely refused to permit the reading of the document in open court before Powell and the other members of the Grand Jury, who signed the document, had first given him an opportunity to read it and apprise himself of its contents. He denied that he said or did anything which could be interpreted as an attempt to deprive the grand jurors of any of their rights to make the fullest investigations of law violations and states that on October 6, 1939, upon the request of the foreman of the Grand Jury, he discussed certain matters with the grand jurors and instructed them that they could not get outside legal assistance, as the District Attorney was the legal advisor and the District Judge the instructor of the Grand Jury; that the District Judge alone was empowered to excuse grand jurors from attending sessions of the Grand Jury, and that this right was not granted to a majority of the members of the Grand Jury and, therefore, the proposal to have members of the Grand Jury excused on written requests addressed to the Grand Jury was illegal. He also informed them that, while all of the members of the Grand Jury could question witnesses appearing before them, it would be more orderly procedure to have the foreman of the Grand Jury propound the questions and then, if any other members of the Grand Jury desired to ask additional questions, they could be propounded *Page 946 
through the foreman; that Powell then remarked "That would be a gag rule. I am being gagged." Whereupon, Salvant, the foreman of the Grand Jury, stated from the first day the Grand Jury was sworn, certain members had been holding secret meetings among themselves at night — going from one house to another, with certain members of the Bar, forming rules and regulations to govern and control the Grand Jury, without inviting the foreman and the other four members of the Grand Jury to be present at the meetings. The respondent says that he informed the grand jurors that they could not exclude the District Attorney and his staff from their sessions as they were the legal advisors of the Grand Jury, and read to them Articles 18, 209 and 215 of the Code of Criminal Procedure of Louisiana. He states that at that time no complaint was made against the District Attorney and his assistants nor was any reason given why the grand jurors wished to secure other counsel for legal advice and from the discussion he was led to believe that the sole purpose of the outside meetings by these grand jurors was to get control of the Grand Jury. He pointed out to them that the Grand Jury could not properly function unless there was harmony and co-operation among all of its members. It appears that they could not even agree as to the hour the Grand Jury should recess for lunch, unless it was decided by a secret vote of the majority. He avers that he advised them not to divide into two groups, to consult the District Attorney for legal advice and to come to him whenever they were in doubt, *Page 947 
as he was always ready and willing to instruct them. He points out that seven of the grand jurors signed the document which provoked the controversy, that four of them, including the foreman, refused to sign it, and the remaining one was absent; that at the time the document was presented in court, only five of the signers thereof were present and that upon their request, the foreman, Salvant, accompanied them in the court room. The respondent avers that when he opened court on October 9, 1939, he noticed an unusually large number of spectators, newspaper reporters and photographers in the court room and was informed that the Assistant District Attorney, Conrad Meyer, had, just previously, attempted to go into the Grand Jury room with certain documents requested by the grand jurors and that they had locked the door from the inside and refused to permit the Assistant District Attorney to enter. His recitation of what happened in the court room is substantially the same as that given by the relators and the others who signed the affidavits annexed to the application for the writs. Respondent reiterates that he instructed Powell twice not to read the document without first letting him examine it and warned him that, if he did so, he would hold him in contempt of court, and that Powell, after hesitating fully a minute, said "I may be in contempt of court, but I am going to read it anyhow." He denies the allegations of the relators' petition that they had a right to read the document as a finding or return in open court, under Article 196 of the Code of Criminal Procedure, and emphasizes the fact that there were only six members of *Page 948 
the Grand Jury present at that time and, therefore, a quorum, which consisted of nine members (Article 206 of the Code of Criminal Procedure and Section 42, Article VII of the Constitution of 1921), was lacking; that the Grand Jury, as a body, could not legally file the document in court or make the report attempted to be made to the court, because it was neither an indictment nor a no true bill, nor a report pretermitting action on a matter under investigation; that it did not concern conditions of asylums or prisons, nor inmates or prisoners therein, and the Grand Jury's authority was restricted, under Articles 210 and 211 of the Louisiana Code of Criminal Procedure, to such matters only and, therefore, it is obvious and clear that seven members of the Grand Jury were likewise powerless to make any such report or finding, or to read a document, or whatever it might be called, which had for its purpose something that was expressly forbidden by these Articles of the Code of Criminal Procedure; that the District Judge was powerless to recuse the District Attorney and his legal staff, other than for causes recited in Articles 310 and 311 of the Code of Criminal Procedure, and was without authority to appoint outside counsel, who had been selected by the Grand Jury; that he had no right whatever to appropriate $10,000 for the purpose of employing additional investigators for the Grand Jury. Respondent also annexed a copy of the controversial document to his return to show that these members of the Grand Jury were acting illegally in utter disregard of his orders and instructions and the law. *Page 949 
We ordered the District Judge to show cause why the writs applied for should not be granted and on the return day, respondent filed, as a part of his return, a copy of the testimony of Sidney DeArmas, one of the relators herein, taken at an open hearing held before Section "B" of the Criminal District Court for the Parish of Orleans, over which the respondent District Judge presides, and which hearing grew out of the charges contained in the document in question. The pertinent part of DeArmas' testimony reads, as follows:
"Judge Platt:
"Q. I believe you testified you met at Mr. Morrison's (Mr. James J. Morrison, one of the Attorneys for the relators herein and one of the Attorneys recommended by the seven grand jurors for appointment by the District Judge as Special District Attorney, in their request for assistance) house on October 1st, 3rd and October 5th? (Brackets ours.) A. That's correct.
"Q. Now, you were discussing this document at the same time? Do you recall when you signed the document? A. We signed it Thursday night at Mr. Morrison's home; so did the other six.
"Q. They were all present? A. All the seven were present that night, yes, sir.
"Q. And was the document read to you all before you signed it? A. Yes, sir, it was read; it was gone over thoroughly, retyped and then signed.
"Q. Well, you say `retyped.' That night it was retyped? A. Yes, sir, Mr. Powell typed it that night on Mr. Morrison's typewriter at home. *Page 950 
"Q. So that, when you gentlemen talked to me on the 6th of October, you already had signed that document? A. That's correct.
"Q. And that was the first time you gentlemen had ever gone into conference with me since you were sworn in as grand jurors; is that correct? A. Yes, that's correct."
"Mr. Meyer:
"Q. Why didn't you tell the Judge you had sought advice and you had this petition drawn up? A. We hadn't yet presented it to the other five members of the jury.
"Q. And you wanted to get special counsel and all at that meeting? Why didn't you do that? A. Well, isn't that between the members of the grand jury? We hadn't been told our powers.
"Q. The Judge told you your powers, didn't he? A. Well, I didn't think they were quite right. Excuse me for saying it, but I didn't think they were quite right.
"Q. And you thought Mr. Morrison was right? A. I had heard other people explain — not lawyers, but different people that explained the powers of the jury. I had received pamphlets.
"Q. What pamphlets? A. We had received pamphlets from the Peoples League.
"Q. That was before you were sworn in, before your name came out? A. That's correct.
"Q. And so when you went in there that morning with this paper signed and *Page 951 
in your pocket — A. Not in my pocket; in Mr. Powell's pocket.
"Q. But seven of you stood around there and spoke to the Judge, knowing this paper was executed? A. Yes, sir.
"Q. And you didn't say anything about it, because you say you didn't want to be thrown off the jury at that time? A. No, don't misunderstand me. I said I didn't want to argue with the Judge. The Judge seemed to know what he was saying. I was no lawyer.
* * * * *
"Q. Did you say anything to Mr. Powell? A. When? When he started to read it?
"Q. Yes. A. Yes, I said, `Go ahead and read it.'
"Q. Did you hear the Judge say not to read it? A. Yes, I heard the Judge say not to read it.
"Q. And you coerced him and urged him to read it? A. I urged him to read it, yes, Mr. Meyer.
"Q. Who advised him to read that paper in court? A. The attorney, Mr. Morrison, advised him to read that paper in court. He said, `Once you start reading it, finish the paper in its entirety; read it all the way through.' But he never did tell us to read it if the Judge ordered us not to read it.
"Q. When you heard the Judge say, `Don't read that paper; submit it to me or come in the office and let's discuss it,' and the Judge said if he read the paper he would be in contempt of court, didn't you then say, `Read it, read it'? A. I don't know if it was before he ordered him or *Page 952 
after he ordered him, but I wouldn't be surprised it was after he told him; not that I wanted to be in contempt of court, but I felt it should be read in open court.
"Q. Even though the Judge said it should not be read? A. Under the circumstances, I felt we had no choice, Mr. Meyer.
"Q. Irrespective of the ruling of the Court, you wanted the paper read; is that what you want to convey? A. I felt it was a matter of public importance and it should be read in open court; not that I wanted to contradict what the Judge said. I would have liked very much to comply with the Judge's request, but I felt we had to do it.
"Q. Irrespective of what the Judge's ruling was, you would want that paper read? A. Not irrespective of what it would be, but what did happen. I am not going to say what could happen, because I don't know what could happen.
"Q. Irrespective of his ruling, you would want that paper read? A. Yes, that's correct."
The obvious purpose of the District Judge in filing this testimony was to show the correctness of the facts as he stated them in his opposition to the application for the writs filed by the relators, and it will be observed that DeArmas' statements corroborate the respondent's statement of the facts. No objection was made by relators to the filing of the testimony and it is not contended that the statements of DeArmas therein are not true. *Page 953 
The law is clear that a District Judge has no right to remove a grand juror without cause, but he has the right to discharge him for "legal cause" or "good cause." State v. McGarrity,140 La. 436, 73 So. 259; State v. Smith, 145 La. 1091, 83 So. 264; State v. Phillips, 164 La. 597, 114 So. 171, and Art. 200, Code of Criminal Procedure. Therefore, the sole legal point before the Court is whether or not, under the facts and circumstances of this case, the District Judge, who empaneled the Grand Jury, had the authority to remove these two members of the Grand Jury for "legal cause." Briefly, did the acts and conduct of these Grand Jurors constitute, under the law, "legal cause" for their disqualification by the District Judge?
It is too clear for argument that the District Judge acted properly in holding these grand jurors in contempt for having defied the orders of the court. It is said by counsel for the relators that what these grand jurors said and did in no way affected their qualifications or fitness to serve as grand jurors and that, having been duly and properly qualified as grand jurors, their appointment or selection is irrevocable for six months, provided that they can be discharged only for "legal cause," and that they have not been guilty of conduct which amounts to "legal cause."
The respondent in no way maintains that a District Judge has the right to arbitrarily, capriciously, or at his pleasure, discharge a grand juror, but he does contend that the two grand jurors in question wilfully and deliberately defied the authority of the court, showed wanton disrespect *Page 954 
and gross contempt of the District Judge's orders and his instructions concerning the law, and that they are persisting in their disrespect and contempt by still grossly abusing and vituperating the District Judge in stating that they could not trust him with the document as they feared he would illegally and arbitrarily suppress it; that, as their arbitrary and illegal acts were committed in their capacities as grand jurors, they have disqualified themselves — for the law requires of the grand jurors proper respect for the rights of others and the rights and authority of the District Judge and the District Attorney with whom they must serve under the law; that their actions and those of the other five grand jurors, who signed the document, were illegal because an attempt was thereby made to rule and govern the Grand Jury by a majority vote, rather than by a vote of nine members, as specified by law; that they illegally attempted to act without a quorum; that they violated the law in seeking and securing the advice and counsel of members of the Bar, when the District Attorney and his staff could not be legally recused, except under Articles 310 and 311 of the Code of Criminal Procedure; that they violated their oath and the law by holding clandestine meetings without inviting the other members of the Grand Jury to be present and by divulging their secrets to outsiders; and that they wilfully and deliberately, contrary to the advice and the instructions of the court, attempted to make a report which was forbidden by Article 210 of the Code of Criminal Procedure and, therefore, destroyed the most essential and fundamental qualifications *Page 955 
of a grand juror, i.e., to be fair and impartial and to observe and obey the law and respect the dignity and authority of the court.
A general statement of the origin of Grand Juries and their powers to investigate criminal matters can be found in the summary of Field, Circuit Justice, in Re Charge to Grand Jury, 1872, 2 Sawy. 667, Fed.Cas.No. 18255, cited in 22 A.L.R. 1356, Annotation, which follows:
"The institution of the grand jury is of very ancient origin in the history of England; it goes back many centuries. For a long period its powers were not clearly defined; and it would seem, from the accounts of commentators on the laws of that country, that it was at first a body, which not only accused, but which also tried public offenders. However this may have been in its origin, it was, at the time of the settlement of this country, an informing and accusing tribunal only, without whose previous action no person charged with a felony could, except in certain special cases, be put upon his trial. And in the struggles which at times arose in England between the powers of the King and the rights of the subject, it often stood as a barrier against persecution in his name; until, at length, it came to be regarded as an institution by which the subject was rendered secure against oppression from unfounded prosecutions of the crown. In this country, from the popular character of our institutions, there has seldom been any contest between the government and the citizen, which required the existence of the grand jury as a *Page 956 
protection against oppressive action of the government. Yet the institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizens against unfounded accusation, whether it come from government or be prompted by partisan passion or private enmity. * * * From theseobservations, it will be seen, gentlemen, that there is a doubleduty cast upon you as grand jurors of this district; one a dutyto the government, or more properly speaking, to society, to seethat parties against whom there is just ground to charge thecommission of crime, shall be held to answer the charge; and onthe other hand, a duty to the citizen to see that he is notsubjected to prosecution upon accusations having no betterfoundation than public clamor or private malice. * * * Your investigations are to be limited: First, to such matters as may be called to your attention by the court; or, second, may be submitted to your consideration by the district attorney; or, third, may come to your knowledge in the course of your investigations into the matters brought before you, or from your own observations; or, fourth, may come to your knowledge from the disclosures of your associates." (Italics ours.)
The drawing and the selecting of grand jurors and their powers and duties are purely statutory in this State and, therefore, not controlled by the common law. These matters are now governed by *Page 957 
the Louisiana Code of Criminal Procedure from which we quote the Articles and parts of Articles pertinent thereto:
Art. 17. "Subject to the supervision of the Attorney-General, as hereinafter provided, the District Attorney shall have entire charge and control of every criminal prosecution instituted or pending in any parish wherein he is district attorney, and shall determine whom, when, and how he shall prosecute; provided, that every district attorney shall have the right to employ or to accept the assistance in the conduct of any criminal case of such counsel as to him may seem fit."
Art. 18. "The District Attorney is the representative of the public and the legal adviser of the grand jury. Whenever required by the grand jury, it shall be the duty of the district attorney of the parish to attend them for the purpose of examining witnesses in their presence or of giving them advice upon any legal matter."
Art. 19. "The District Attorney shall be allowed at all times to appear before the grand jury for the purpose of giving any information relative to any matter cognizable by them; but no district attorney or other person shall be present during the deliberations of the grand jury on their findings."
Art. 22. "Each district attorney in every criminal case in which an appeal shall have been taken from his district or parish to the Supreme Court, or in which the supervisory jurisdiction of that court shall have been invoked, shall prepare and forward a brief to the Attorney General for his revision and use in the Supreme Court." *Page 958 
Art. 23. "The Attorney General and his assistants shall have power and authority to institute and prosecute, or to intervene in any proceeding, civil or criminal, as they may deem necessary for the assertion or protection of the rights and interests of the state; and furthermore, the Attorney General shall exercise supervision over all of the District Attorneys throughout the state and shall represent the state in criminal cases on appeal."
Art. 24. "Each district attorney shall, on or before the Thirty-first day of January of each year, make a written report to the Attorney General, covering the last preceding calendar year, setting forth the number of persons prosecuted in the several parishes within his district, the number of convictions, the nature of the crimes for which the prosecutions were instituted, the nature of the crimes the prosecutions of which resulted in convictions, the number of acquittals and the causes of all acquittals which have resulted from a defect of legislation, accompanied by such observations on the criminal jurisprudence of the State, as his experience shall warrant and require."
Art. 25. "The Attorney General shall consult with and advise the District Attorneys in all matters appertaining to the duties of their office, and shall make and submit to the Legislature, at the commencement of each regular session, a report of all the official business done by him since the last preceding report by the Attorney General, specifying the suits and prosecutions in which he may have attended; the number of persons prosecuted; the crimes *Page 959 
for which, and the parishes where, such prosecutions were had; the results thereof and the punishment therefor; and this report shall be in addition to the reports provided for in Title 32 of this Code."
Art. 196. "* * * Each Grand Jury shall be under the exclusivecontrol and instruction of that judge of the section of the CriminalDistrict Court who shall have appointed said Grand Jury and suchGrand Jury shall make all of its findings and returns in opencourt to said judge; * * *." (Italics ours.)
Art. 197. "All vacancies occurring in the membership of thegrand jury shall be filled by the judge of that section of thecourt in which it shall have been impaneled, who shall either order the jury commission to draw from the jury wheel not less than twelve names, from which he shall select the persons necessary to fill said vacancies, or he shall select from the panel of petit jurors serving in his section such number of persons as may be necessary to fill said vacancies." (Italics ours.)
Art. 200. "The grand jury of the Parish of Orleans shall serve for six months unless sooner discharged by the court."
Art. 204. "Upon the impanelment of the grand jury, each of the grand jurors shall be sworn that he will diligently inquire and true presentment make of such matters and things as shall be given to the grand jurors in charge, or otherwise come to his knowledge; that he will keep secret his own counsel, that of his fellows and that of the State; that he will present no one from envy, hatred, or malice and will not leave any one unpresented from fear, favor, affection, *Page 960 
hope of reward, or gain, but will present all things truly, as they come to his knowledge, according to the best of his understanding; * * *."
Art. 205. "Upon the impaneling of such grand jury the district judge shall charge the grand jurors upon their duties."
Art. 206. "The grand jury of each parish shall consist of twelve members, nine of whom shall be necessary to constitute aquorum and nine of whom must concur to find an indictment."
(Italics ours.)
Art. 207. "The grand jury shall meet at the parish seat at such times as the judge may order, provided that without leave of court no adjournment shall be for a longer time than three days."
Art. 208. "The grand jury may be called in special meeting at any time or at any place within the parish by the district judge, or by the foreman with the approval of the district judge."
Art. 209. "The grand jury shall inquire into all crimes punishable with capital punishment and into all other crimes triable within the parish, when their attention has been directed to the subject of such crime either by instructions from the court or at the instance of the District Attorney, and the grand jury ought to find an indictment in every case submitted to them in which, in their judgment, the evidence before them, if unexplained and uncontradicted, would warrant a conviction."
Art. 210. "The grand jury shall have power to act only in oneof the following ways:
"First: By returning a true bill; *Page 961 
"Second: By returning not a true bill; or
"Third: By pretermitting entirely the matter investigated — that is to say, by not returning either a true bill or not a true bill or taking other action.
"If the evidence presented to the grand jury does not justify finding a true bill, the grand jury shall limit its action toreturning not a true bill or pretermitting all action, and thegrand jury shall not, in any case whatever, make any report onany matter submitted to it for investigation, except in themanner hereinabove indicated, as the grand jury is an accusatorybody and not a censor of public morals. It shall make no reportsto the court other than the return of presentment or indictment,except as specifically provided in Article 211 hereof." (Italics ours.)
Art. 211. "Each grand jury shall inspect every prison, place of detention, asylum and hospital within the parish, and make report to the district judge of how the prisoners and inmates of every such institution are treated, and every such report shall state the number of prisoners and inmates in every such public institution, and the costs of maintenance, and shall state the length of time that each prisoner awaiting trial, at the time of said report, shall have been so held for trial."
Art. 212. "The foreman, or in his absence, the acting foreman, shall administer the oath to each witness appearing before the grand jury."
Art. 213. "In the investigation of a crime the grand jury can receive no other than *Page 962 
legal evidence and such as is given by witnesses produced and sworn before them, or furnished by legal documentary evidence."
Art. 215. "The sessions of the grand jury shall be secret, but the District Attorney, as their legal adviser, shall have free access to said sessions; * * *."
A reading of the foregoing Articles definitely shows that the grand jurors are under the control and instructions of the District Judge, who empaneled the Grand Jury, at least to the extent of requiring them to observe and obey the law, and that the District Attorney and his assistants are their legal advisors. The grand jurors have no right to exclude the District Attorney from their sessions and to practically deprive him of his office by ignoring him. The District Judge and the District Attorney must be respected and permitted to act in their official capacities as long as they occupy their offices and until such time as they are either recused, superseded, removed or recalled from office. Grand jurors have no right to supplant the District Attorney as their legal advisor by accepting the advice and counsel of some members of the Bar of their own selection, and this is particularly true when this is done by some of the grand jurors on their own initiative and the District Attorney and his staff have not been recused, superseded, removed or recalled from office. Therefore, the District Judge properly instructed these grand jurors in their meeting of October 6, 1939, that the grand jurors could not make rules and regulations to govern themselves, which were contrary to the law and that they *Page 963 
must realize that the law which gave them the official status as grand jurors, likewise made the District Attorney and his staff their legal advisors and placed them under the direction and instructions of the District Judge. At that time, these grand jurors did not make any complaint against the District Attorney and his staff nor did they accuse them of neglect of duty or misconduct and the main difficulty appeared to be that seven of the grand jurors were unable to co-operate with the other five in their deliberations. They were admonished by the District Judge that it was their duty to act in harmony and accord, so that they might function properly. There was no complaint that either the District Judge or the District Attorney tried to control them in their deliberations and their investigations to determine if indictments or no true bills should be returned.
This was the status of affairs preceding the trouble that arose in the court room on October 9, 1939, when the relators deliberately disobeyed the court's orders and were adjudged in contempt of court.
Article 11 of the Louisiana Code of Criminal Procedure reads, as follows: "Every court has the inherent power to enforce the orders which it has power to render, and it is the inherent duty of every judge to see that the proceedings in the court in which he presides shall be carried on decently, with dignity and in an orderly manner; hence every court has authority to issue such writs and orders as may be necessary or proper in aid of the jurisdiction conferred upon it, and to punish, as being a contempt, every interference *Page 964 
with or disobedience of its process or orders, as well as every act interrupting or tending to interrupt its proceedings, or impairing the respect due to its authority. Failure to appear for arraignment or trial on the day fixed therefor, after notice, shall be considered a contempt of the court's authority; provided that no one shall be punished for any contempt committed outside of the presence or hearing of the court, except after hearing upon a rule to show cause why he should not be punished for such contempt, served upon him at least twenty-four hours before such hearing."
In State v. Judge, etc., 50 La.Ann. 552, 556, 23 So. 478, 480, the court said: "The power of the court to punish for contempt is exercised for two purposes: (1) To vindicate its dignity for disrespect shown to it or its orders; (2) to compel the performance of some order or decree of the court which it is in the power of the party to perform and which he refuses to obey."
In State ex rel. v. Sauvinet, 24 La.Ann. 119-121, 13 Am.Rep. 115, the court said: "A contempt of court is an offense against the State and not an offense against the judge personally. In such a case the State is the offended party, and it belongs to the State, acting through another department of its government, to pardon or not to pardon, at its discretion, the offender."
And in the same case, the Court quoted from an opinion of Judge Thatcher of the High Court of Errors and Appeals of Mississippi, Ex parte Hickey, 4 Smedes M. 751, as follows: "`The whole doctrine of contempt goes to the point that the offense *Page 965 
is a wrong to the public, not to the person of the functionary to whom it is offered, considered merely as an individual. It follows then that the contempts of court are either crimes ormisdemeanors in proportion to the aggravation of the offense, andas such are included within the pardoning power of this State.'"
(Italics ours.)
Any conduct that, in law, constitutes an offense against the authority and dignity of a court or judicial officer in the performance of judicial functions is a contempt. Ex parte Earman,85 Fla. 297, 95 So. 755, 31 A.L.R. 1226.
Contempt is also defined to be a wilful disregard or disobedience of a public authority. Melton v. Commonwealth,160 Ky. 642, 170 S.W. 37, L.R.A. 1915B, 689.
"Contempt of court is a specific * * * offense." Worden v. Searls, 121 U.S. 14, 7 S.Ct. 814, 820, 30 L.Ed. 853; New Orleans v. New York Mail S.S. Co., 20 Wall. 387, 22 L.Ed. 354; Hotaling v. Superior Court, 191 Cal. 501, 217 P. 73, 29 A.L.R. 127, and American Jurisprudence, Vol. 12, p. 387, par. 2.
In the Federal Courts, the judge not only has the right to discharge a grand juror for cause, the legality of which will be conclusively presumed, and the record cannot be contradicted by oral testimony, but in some of the cases it is stated that the Court has the discretion to excuse the foreman or any member of the Grand Jury. U.S. v. Belvin, C.C.Va.1891, 46 F. 381; U.S. v. Mitchell, C.C.Or. 1905, 136 F. 896.
In the case of State v. Gunter, 188 La. 314, 177 So. 60, the accused moved to *Page 966 
quash the indictment on the ground that the grand jury, which returned it was illegally constituted, because one of the members thereof had a felony charge pending against him at the time he was selected and served as a member of the Grand Jury. The evidence showed that this grand juror had been charged in 1905 with the crime of shooting at a dwelling house and was convicted and sentenced. On appeal, the verdict of the jury and the sentence of the court were set aside and the case remanded. The case was not retried and was placed on the dead docket, where it remained without any further action until the defendant's motion to quash the indictment was filed in 1937, when the district attorney entered a nolle prosequi. The juror had lived all of the thirty-two intervening years in the same Parish where he had exercised his rights as a citizen. This Court held that the indictment was void, because the charge was still pending against the accused when he acted as a member of the Grand Jury and under Article 172 of the Code of Criminal Procedure, he was lacking in the necessary qualifications to serve as a grand juror as he was "charged with an offense."
In State v. Phillips, 164 La. 597, 598, 114 So. 171, 175, with reference to the right and authority of a district judge to discharge a grand juror for cause, this Court said: "Bill No. 6 was also reserved to the overruling of a motion to quash the indictment. The motion, which was the third one filed with that object in view, is based upon the ground that the indictment was returned by an illegally constituted *Page 967 
grand jury, made illegal by the unlawful removal of E.W. Bryant from that body and by the substitution of J.M. Coffey in Bryant's place. It appears that soon after the grand jury had been impaneled and charged, and had retired to the grand jury room to proceed with its labors, the trial judge learned that a charge of assault and battery was pending against Bryant, and was pending against him when he was drawn and sworn as a grand juror. The affidavit, preferring the charge, was lost at the time of the trial of this motion. However, the minutes of the court show that the affidavit was before the court, when Bryant was discharged, * * *. The fact that there was a criminal charge pending against Bryant at the time he was impaneled as a grand juror rendered him an incompetent juror. Section 1 of Act 135 of 1898. The trial judge was therefore correct in removing him from the grand jury. After the removal of Bryant, the trial judge caused those on the grand jury venire, who had not been called as grand jurors, to be resummoned, as disclosed by the minutes, and from the envelope containing their names, the name of Coffey was drawn, and he was duly sworn as a grand juror and charged as such. The proceeding was regular. Section 8 of Act 135 of 1898, and Act 155 of 1906; State v. Furco, 51 La.Ann. 1082, 25 So. 951. The motion to quash was properly overruled."
If the Court is vested with the power to remove a grand juror and is justified in discharging a grand juror who has a misdemeanor charge pending against him for *Page 968 
an offense committed before his selection and induction into office, notwithstanding the fact that an accused charged with a criminal offense is presumed to be innocent under the Constitution, until he is tried and found guilty, certainly, if a grand juror thereafter violates the law and a charge is filed against him for a misdemeanor, such as assault and battery, it follows that the District Judge would likewise be justified in removing him for cause. So that, if a grand juror wilfully and deliberately, in his capacity as a grand juror, disobeys the law, after receiving instructions thereon from the District Judge, and disregards the orders of the court and flaunts the dignity of the District Judge in open court, and is adjudged guilty of contempt of court, it necessarily follows that he has demonstrated his own unfitness and furnished the legal cause for his own disqualification to serve as a member of the Grand Jury.
There can be no doubt that these two grand jurors were acting in their official capacities as grand jurors and not as individuals. It is clear that the offense committed by them did not grow out of any personal matter with the District Judge but arose solely and only from his office as District Judge and their instructor. The request for assistance was addressed to him in his capacity as District Judge and he simply asked Powell to hand the document to him so that he could read it before letting the grand juror read it publicly. The relators, as grand jurors, in spite of the court's admonitions and warnings, refused to permit the District Judge to first *Page 969 
read the petition or request for assistance, although it was addressed to him. They attempted, in their capacities as grand jurors, in defiance of the authority of the court, to read the document publicly, without permitting the District Judge to see the document and precipitated a scene and great confusion in the court room. If it be said that they acted under the stress and excitement of the moment, after having had adequate time to calm themselves, they failed to apologize to the court for their disrespect and disobedience of its orders. In their application to this Court for writs, they state that they were "not motivated by any disrespect for the orderly enforcement of the law by any attack on the dignity of the court, but, on the contrary, were stimulated by a sincere desire to effectuate the machinery of law enforcement through a diligent and conscientious fulfillment of their duties as grand jurors, * * *" but, in a brief, which was filed a week after their application for the writs was lodged here, they said "your petitioners, upon the instructions of a majority of the Grand Jury, refused to submit this document to the prior inspection of the judge, because they feared that the said judge, upon obtaining control of this document, would suppress it from publication. This fear was grounded upon prior conduct of the judge, who, three days before (October 6, 1939), had called them upon his own initiative, into his office, and had given them instructions concerning their duties and obligations, concerning the control over them by the district attorney, and concerning the method *Page 970 
in which they should conduct their business, which instructions, the judge advised them were given in executive session, and subject to their oath of secrecy, and on no condition should be revealed to anyone. * * * The majority of the grand jurors felt that this was an attempt on the part of Judge Platt to isolate them from independent sources of information, and to place them at the mercy of whatever advice was given them by the district attorney and the judge." So, it is very apparent that instead of showing an apologetic attitude for their defiance of the order of court, the relators are persisting in their disrespect by accusing the District Judge of improper motives and illegal conduct. They are inconsistent and contradict themselves by saying they meant no disrespect to the Judge and later, in their brief, conclusively showing that they fully intended to disregard the instructions of the District Court and to defy the District Judge's authority. The District Judge had a right to require the jurors to submit the document for his inspection and it was their duty to comply with his request. It was mere conjecture for them to say that they defied his order because they feared he might suppress the document from publication, when they would not even extend him the courtesy of an opportunity to read the document. If the District Judge had illegally ruled that the document could not be read or filed, his actions in that respect would have been subject to review by the tribunal of superior jurisdiction in an orderly manner. The conduct of these two grand jurors was nothing more or less *Page 971 
than taking the law in their own hands in defiance of the order of their duly constituted legal instructor.
Relators' counsel strenuously argue that these two grand jurors could not be adjudged guilty of contempt of court and removed for legal cause when they acted fully within their legal rights as such officials, citing State v. Simone, 154 La. 73, 97 So. 302.
Generally, it may be said that all public officials are entrusted with certain powers upon which the lawmakers, in their wisdom, have placed limitations and restrictions. Grand jurors, as public officials, are no exception to this rule. A casual perusal of the Articles of our Code of Criminal Procedure, which control and govern the subject matter, clearly shows the control and the supervision that the law has granted to the District Judge in instructing and directing the Grand Jury. The law is likewise explicit that the District Attorney is the official legal advisor of the grand jurors and has the right of free access to their sessions. Neither the District Judge and the District Attorney nor, reciprocally, the members of the Grand Jury can disregard the power and authority entrusted to them respectively. Each has certain serious duties and responsibilities to fulfill in their respective capacities, in accordance with law. None of them can substitute rules, regulations, opinions and convictions for the law. They must all observe, obey and respect it. The very fact that their official status gives them greater public recognition than individuals, should impel them to act with great care *Page 972 
and caution in administering the law and discharging their duties and responsibilities. Articles 210 and 211 of the Louisiana Code of Criminal Procedure, which we have already fully quoted, unquestionably and in the clearest language, place restrictions on the powers of the Grand Jury.
To show that there can be no mistake or misunderstanding about the correct interpretation and construction of Articles 210 and 211 of the Criminal Code, we quote from the explanation of the Code by Messrs. St. Clair Adams, Howard B. Warren and S.R. Thomas (all former District Attorneys in this State), the members of the Commission who were appointed in 1926 and drafted it, in their report to the Governor of the State, which is found on pages 561 and 562 of Dart's Louisiana Code of Criminal Procedure, as follows: "The following is a partial list of the changes that we have made in the existing law of criminal procedure: * * * (7) * * * The powers of the grand jury have been limited to returning a true bill; not a true bill; or pretermitting entirely the matter investigated. Not being a censor of public morals, the right of the grand jury to make reports has been confined to its investigation of certain designated public institutions."
The existing law above referred to being Act No. 135 of 1898, Section 7, which was amended by Act No. 155 of 1906, reads in part, as follows: "* * * The grand jury shall be composed of twelve members, nine (9) of whom must concur to find anindictment, and nine members present shall constitute a quorumfor the *Page 973 transaction of business with full power and authority toinvestigate all matters and to find and report indictments andother matters, the same as if the twelve were present and acting, provided that when less than twelve are present, at least nine(9) shall concur to find indictments or report on other matters. * * *" (Italics ours.)
In the Parish of Orleans, the Grand Jury consisted of 16 persons, 12 of whom constituted a quorum. Its term of service was limited to three months, and each judge of the Criminal District Court was given, alternately, entire control of the Grand Jury, both as to its selection and instruction. (See Sec. 3, Act No. 98 of 1880).
The Constitution, however, reduced the number from sixteen to twelve, and increased the term to six months. (Article 117, Const. 1898).
The reason for this change in the law was to eliminate the practice by certain members of Grand Juries of villifying and defaming their political opponents or official adversaries or personal enemies by making their return in the form of a resolution or a report, without indicting the person or persons castigated or excoriated in the resolution or report and the practice by grand jurors of censuring individual and public morals, in a similar manner. This placed the victims in the position of having to stand mute because they were not charged with any crime but merely accused of wrongdoing and were without an opportunity to defend themselves against the accusations in court, so as to vindicate their good name and reputation. The members *Page 974 
of the Commission who drafted the Code had two years to consider its proposed provisions, and the members of the Legislature, in the Regular Session of 1928, adopted the proposed Code with such amendments as they thought necessary. In short, the framers of the Code and the members of the Legislature deemed it wise and in the interest of orderly public justice to limit and restrict the power of the Grand Jury, since, in some instances it had been used in an arbitrary, unjust and unfair way. The Legislatures of the different States of the Union have also found it necessary to likewise restrict the plenary power granted to Grand Juries under the common law.
It has been held that in the absence of a Statute authorizing the Grand Jury to make reports, which do not amount to indictments or presentments, reports are not privileged, because extrajudicial, and therefore may form the basis for libel.
In Poston v. Washington, A. Mt. V.R. Co., 1911, 36 App.D.C. 359, 32 L.R.A., N.S., 785, the court said: "The `presentment' so called, that is under consideration, is nothing of this kind. The Grand Jury having found no justification for the indictment or presentment of the railway company, its regular and proper course would have been so to report to the court that, its duties being ended, it might be discharged. It might, possibly, have indicted the complainant for false swearing, or made a presentment to that effect as the foundation of an information, if one would lie for such an offense. Instead of pursuing the latter course, a long report was made, reciting as facts matters calculated *Page 975 
to bring the complainant into public contempt and disgrace. It was not, and was not intended to be, a presentment on which he could be cited to show cause why an information should not be presented against him. Had it been, he could have had an opportunity to test the truth of the charges upon trial. * * * Our conclusion is that the report of the grand jury in this case was beyond its special powers and jurisdiction in the premises, and that its publication is not a matter of privilege."
In the case of Rector v. Smith, 1860, 11 Iowa, 302, in an action for libel, it was held that a grand juror could only present to the court the misconduct of an official by indictment and that a report imputing misconduct in office to a county judge was beyond its power. The Court said: "The grand jury have no power, nor is it their privilege or duty to present any person for a criminal offense except by indictment. If the misconduct of an officer does not amount to a crime, and is not of such magnitude as will justify the jury in finding an indictment, their powers over the offense complained of, are at an end."
In Bennett v. Kalamazoo Circuit Judge, 1914, 183 Mich. 200, 150 N.W. 141, Ann. Cas. 1916E, 223, the Michigan court held that where the Statutes do not provide for reports by grand jurors as to the conduct of public officials, a report reflecting on the official conduct of the prosecuting attorney, not followed by an indictment, should be expunged from the records of the court on the motion of the official assailed, citing In re Osborne, 68 Misc. 597, 125 N.Y.S. 313. *Page 976 
In the case of Jones v. People, 1905, 101 App. Div. 55, 92 N YS. 275, 276, 16 N.Y. Anno.Cas. 15, 19 N.Y.Cr.Rep. 59; In re Jones, 181 N.Y. 389, 74 N.E. 226, the Grand Jury made a report or presentment condemning certain officials' misconduct and delinquency but did not follow it with an indictment of those responsible therefor. The majority opinion of the court pointed out that the statute under which the Grand Jury acted expressly authorized it to inquire "into the willful and corrupt misconduct in office, of public officers of every description, in the county." In view of this statute, the New York Court refused to set aside a report or presentment of the Grand Jury made in the exercise of its inquisitorial powers, censuring public officials for improper performance of their duties, although an indictment did not and could not follow it, but stated "It is true that accusation without opportunity to answer in the forum is a bitter hardship, if not intolerable." The Court cited the opinion of Lord Mansfield in Rex v. Roupell, 1776, Cowp. pt. 2, p. 458, 98 Eng. Reprint, 1185. A strong dissenting opinion was entered which, as we shall see, five years later, was declared by the same Court to be founded on "better reason" than the majority opinion. In pointing out the dangers which may result from application of the rule laid down by the majority of the Court, Woodward J., said:
"The grand jury of Nassau county, in December, 1903, made a presentment to the Supreme Court, in which the board of supervisors and two men who had acted as clerks of the board were censured for not *Page 977 
performing the duties of their respective offices in a manner to meet the approval of the grand jury. The individuals thus censured, with no opportunity offered them to be heard in their own defense, petitioned the County Court of Nassau County, asking that the presentment be set aside and quashed on the ground that such presentment was without authority of law. * * * The question presented by this record * * * involves the legal right of the grand jury to bring in a presentment against individuals where the evidence adduced does not disclose that any crime has been committed. In other words, we are asked to determine whether the grand jury, acting under the laws of this state, is authorized to make a public record (section 272, Code Cr.Proc.) censuring individuals for alleged misconduct, where the conduct alleged does not constitute a crime; whether the state of New York has established an inquisition in which the conduct of citizens may be reviewed and officially criticised and censured, according to the standards of ethics or morals of such board, rather than by those standards which have been fixed and determined by the law of the land. * * * In determining the powers of the grand jury under the laws of this state, whether regulated by statute or usage constituting the common law, we have a right to consider what that body might do under this indefinite power of making presentments if that power be conceded. If it has the right to censure the petitioners in the matter now before us, it is difficult to conceive of any limitation upon the powers of the grand jury. It may establish its own standards of right and *Page 978 
wrong, and may subject the citizen to the odium of a judicial condemnation without giving him the slightest opportunity to be heard; oftentimes working, in the public estimate, as great an injury to his standing and character as though he had in fact been accused of a crime. This is a perversion of the essential spirit of the grand jury system, which had for its object the protection of the citizen against an open and public accusation of crime, and from the trouble, expense, and anxiety of a public trial, before a probable cause is established by the presentment and indictment. * * * It cannot be that it was ever contemplated that this body, created for the protection of the citizen, was to have the power to set up its own standards of public or private morals, and to arraign citizens at the bar of public opinion, without responsibility for its abuse of that power, and without giving to the citizens the right to a trial upon the accusations. * * * There are two great purposes — one to bring to trial those who are properly charged with crime, the other to protect the citizen against unfounded accusation of crime. When the grand jury goes beyond this, and attempts to set up its own standards, and to administer punishment in the way of public censure, it is defeating the very purposes it was intended to conserve; and its action cannot, therefore, be lawful. Section 6 of article 1 of the state Constitution provides that `no person shall be held to answer for a capital or otherwise infamous crime * * * unless on presentment or indictment of a grand jury, and in any trial in any court whatever the party accused shall be allowed to appear and defend *Page 979 
in person and with counsel as in civil actions.' The inhibition that the citizen shall not be held to answer unless upon a presentment or indictment must be understood as guarantying the right to answer when such a presentment or indictment is found, and `the party accused shall be allowed to appear and defend in person,' etc.; while by section 2 of the same article this right is further protected by the provision that `the trial by jury in all cases in which it has been heretofore used shall remain inviolate forever.' In other words, a `presentment or indictment,' as applied to the citizen by our Constitution, contemplates, in substance, the same thing. It contemplates an accusation of crime, to be followed by an answer on the part of the person thus formally accused, with an opportunity to be heard in his own defense before a jury of his peers. The terms are, in their relation to the individual, synonymous. No one would contend that a citizen could be indicted for anything less than a crime, or that, if indicted, he could be denied an opportunity to answer and to appear in his own defense before a jury; and itseems to me equally clear that there is no constitutional rightto make a presentment against an individual in a case where anindictment would not lie. The rights of the citizen are the same under either an indictment or a presentment. There is the right to answer and to appear in person and by counsel, and to have a trial by jury in any case in which an indictment might properly be made. * * * the chief distinction between an indictment and a presentment at common law was that the former was made at the suggestion of the crown, while the latter *Page 980 
was made upon the knowledge of one or more of the jurors, and, instead of being indorsed `A true bill' by the foreman alone, was signed by all of the jurors. * * * This idea runs through all ofthe authorities which I have been able to discover, that thejurisdiction of the grand jury over individuals must depend uponthe fact that a crime or offense has been committed against thepublic. * * * If the acts charged do not constitute a crime, thenthere is no indictment before the court, and the petitionersclearly have a right to be relieved of the odium of a judicialcensure, where the document in which such censure is contained isa mere impertinence, without authority of law." (Italics ours.)
In the case of Matter of Gardiner, 1900, 31 Misc. 364, 64 N YS. 760, 761, the Grand Jury made a "presentment" criticizing the conduct of a District Attorney. The court stated that while it would not expunge the presentment from the record, it would set aside or quash it on motion. In discussing the right of the Grand Jury to make the "presentment" the court said: "`Sometimes, however, our grand juries make a sort of general presentment of evil and evil things, to call public attention to them, yet not as instructions for any specific indictment. No one could be called to answer to such a presentment.' * * * While it may beobserved that the court has tolerated, rather than sanctioned,such presentments of things general, yet the grand jury shouldnever, under cover of a presentment, present an individual inthis manner, for, if it have legal evidence of the commission ofthe crime, it should find an indictment *Page 981 against him upon which he could be held to answer, and, if ithave no such evidence, it ought, in fairness, to be silent. Thepowers of the grand jury extend only to questions of crime. Itsfunctions are not executive, but judicial. It is, in fact, apreliminary tribunal, and it is furnished with inquisitorialpowers only for the purpose of examining into crimes." (Italics ours.)
In Re Osborne, 1910, 68 Misc. 597, 125 N.Y.S. 313, 318, the Grand Jury presented a paper or report reflecting upon the professional integrity of the Deputy Attorney General, who instructed the Grand Jury to return a "no true bill" because of a lack of evidence. He made a motion to have the report stricken from the record, and the Court said:
"It has become a custom of almost invariable occurrence that the grand jury, at the close of its term, makes a presentment on some subject on which, frequently, no evidence has been heard. This, no doubt, proceeds from the zeal of its members to promote the general welfare by calling attention to certain conditions which they believe should be remedied. So long as they are confined to matters of general interest, they are regarded as harmless, even though a waste of time and effort, and after the ephemeral notice of the day has passed they are allowed a peaceful rest. But it is very different when the motives andconduct of the individual are impugned, and he held toreprobation, without an opportunity to defend or protect his nameand reputation, for it must be borne in mind that, if thegentlemen of the grand jury were to meet *Page 982 as an association of individuals and give expression to thesentiments contained in a presentment, little attention would bepaid to them, and a healthy regard for the responsibility ofutterances injurious to the individual would, in all probability,restrain exaggerated and unfounded statements. The mischiefarises from a prevalent belief that a grand jury making theconventional presentment speaks with great authority and actsunder the sanction of the court, thereby giving to itsdeliverance a solemnity which impresses the mind of the public.This is a grave error. The powers and duties of a grand jury aredefined by law. No matter how respectable or eminent citizens maybe who comprise the grand jury, they are not above the law, andthe people have not delegated to them arbitrary or plenary powersto do that, under an ancient form, which they have not a legalright to do. * * *
"Some states have abolished the grand jury system. This state yet preserves it, and it may be wise that it does so, for it is an institution that has indelibly impressed upon the pages of history a record for the protection of the citizen against the arrogance and oppression of power and has inspired in the hearts of the lawless and corrupt a healthy fear of its powers and honesty. But its action should be checked when, from thoughtlessness or misconception of its jurisdiction or an exaggerated idea of its own importance, it arraigns the citizen in phrases accusing him of acts or conduct which in themselves are not criminal, thereby precluding him *Page 983 
from the right guaranteed by the Constitution to every man to meet his accusers face to face before a jury of his peers, but which are the more insidious and harmful because they must remain without answer or denial. Such is this case, and in the interests of justice I am constrained to protect the Attorney General and his deputies from an injustice by directing that the paper presented to the court by the grand jury, bearing date the 7th day of April, 1908, and entitled `a presentment,' be stricken from and expunged from the records of this court." (Italics ours.)
The court, in the course of its discussion, in referring to the dissenting opinion in the Jones v. People case, supra, stated that it was founded on the "better reason" than the majority opinion.
In the case in Re Heffernan, Co.Ct. 1909, 125 N.Y.S. 737, 738, in discussing the powers of the Grand Jury — where a "presentment" charging certain officials with "neglect of their duties and of the public interests" was set aside and expunged from the records on the ground that it was made by the Grand Jury in excess of its powers, the court said: "They are not part of the administrative government of a great municipality. They have the fullest and amplest power to investigate, as it is their solemn and prescribed duty to do, into `the willful and corrupt misconduct in office, of public officers of every description, in the county.' Finding any such evidence of willful and corrupt misconduct, it would be their clear duty to indict. Then the official could have his day in court, where he *Page 984 
would receive either the condemnation which he deserved if his actions have been unlawful, or the vindication that he would desire in case he was blameless. From a grand jury obviously nothing but the fairest considerations of any questions submitted to them is expected. The Star Chamber of the olden days no longer exists, and any action on the part of a grand jury which would partake of the character of the proceedings of that ancient and abhorred system would not be tolerated to-day."
In the matter of Re Woodbury, Sup. 1915, 155 N.Y.S. 851, 852, the Grand Jury severely censured the police board of the city for the lax manner in which the excise law appeared to have been enforced. In New York there was a statute which authorized the Grand Jury to inquire into official wilful and corrupt misconduct. The Court said that while the Grand Jury would have the right to make the presentment, if it were done under the guise of accusing a person without indicting him and thereby compelling him to stand mute, the presentment should be expunged from the record. We quote the language of the Court:
"It is urged on the part of the petitioner that the vice of the presentment is that, instead of describing a general condition, it specifies the individuals who it is claimed refused to enforce the law, and therefore have violated the law, and that the presentment was made purely for political purposes; that the effect of this presentment and the newspaper articles which developed out of the same hold the petitioner, *Page 985 
who has always borne a reputation for honesty, integrity, and good character, up to public criticism, condemnation, and censure, without giving him an opportunity to defend himself, or show that he is not guilty of aspersions cast upon his integrity; and that it will result in irreparable damage to his business, and otherwise affect his social standing in the community and his good name and reputation.
* * * * * *
"The grand jury as now existing is purely a statutory body. No authority can be found in the statute which justifies a presentment being submitted to the court when signed by four members as a committee. As far as appears from the face of the report, it nowhere indicates that a vote was taken by the grand jury and the result concurred in by at least twelve grand jurors, or any action taken by them in regard to it, since it is signed by a committee of four. If in fact it was found or considered or voted upon by the grand jury, the return in its present form has no authority in law, and therefore is void and nugatory.
"The belief is warranted, as far as appears from the report, that but four members of the grand jury, who constituted the committee and signed the presentment, were alone the members of the grand jury who participated in the action which resulted in the resolution objected to by the petitioner, and it was therefore void, since a presentment identically as an indictment — if the distinction is to be continued — cannot be found without the *Page 986 
concurrence of at least twelve grand jurors, and when found must be signed by the foreman of the grand jury.
"There can be no question as to the authority of the court to keep its own records free from matters of an immaterial or improper character, and concluding, as I do, that this presentment is the work of individuals, rather than that of the grand jury, and therefore without authority in law, the relief asked for by the petitioner is granted."
In State v. Davenport, 1920, 79 Okla. 297, 193 P. 419, the Court dismissed the accusation of the Grand Jury, although the Grand Jury, by express statute of the Legislature of Oklahoma, was authorized to present the accusation for removal of an officer upon the grounds enumerated in certain sections of that statute — holding that the Grand Jury had no jurisdiction or authority to present the accusation for other causes enumerated under a special statute, which provided that all actions thereunder must be commenced in the name of the State on the relation of the Attorney-General.
In Ex parte Robinson, 1936, 231 Ala. 503, 165 So. 582, 584, the petitioner moved the Circuit Court to expunge from its records the report of a Grand Jury in which he and his official acts were criticized. No indictments were returned against him, but he, as City Commissioner, was criticized by the report. In this case, the Supreme Court of Alabama said: "We are clear that the petitioner had the legal right to have the report expunged, and that mandamus is the appropriate *Page 987 
method of review, since this is not an adversary, but an ex parte proceeding."
In Re Wilcox, 153 Misc. 761, 276 N.Y.S. 117, 124, the Court said: "It cannot be that it was ever contemplated that this body, created for the protection of the citizen, was to have the power to set up its own standards of public or private morals, and to arraign citizens at the bar of public opinion, without responsibility for its abuse of that power, and without giving to the citizen the right to a trial upon the accusations."
In People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 367, the Court said: "An indictment may be challenged — even defeated. The presentment is immune. It is like the `hit and run' motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed."
In State v. Bramlett, 166 S.C. 323, 164 S.E. 873-875, it was held that "* * * a grand jury transcends its powers and exceeds its duty when in its presentment * * * it presents an officer or person by name, and with words of censure and reprobation, without presenting him for indictment."
In the case of Coons v. State of Indiana, 191 Ind. 580, 134 N.E. 194, 195, 20 A.L.R. 900, the Grand Jury filed what it denominated as their report to be filed in Court, making an attack upon the presiding judge and the finding was that the same contained "scandalous, false, libelous *Page 988 
and contemptuous language." We quote from the decision:
"Contempt. — Grand Jury Report. — Accusation of Judge. — Statutes. — The statutes (§§ 1961, 1978 [1979], 2041 Burns 1914, Acts 1905, p. 584, §§ 93, 107, 170) governing the duties of the grand jury contemplate only a presentment by indictment for felonies and misdemeanors, whether against officials or private individuals, and it is not the duty or privilege of the grand jury, where it deems the evidence insufficient to warrant the return of an indictment, to make accusations against citizens in the form of a report; hence it has no right, by a so-called report, to accuse the judge of conspiring to protect criminals, and such accusation is not privileged. * * *
"The duties of the grand jury are governed by statute, and it has no rights or privileges based upon the common law.
* * * * * *
"Criminal contempts of court embrace all acts committed against the majesty of the law or the dignity of the court, and the primary purpose of the punishment of such offenders is the vindication of public authority, of which the court is the embodiment. As was well said by the Supreme Court of Colorado in the case of People v. Green (1883), 7 Colo. 237, 3 P. 65, 49 Am.Rep. 351: `A proper regard for the integrity of our honored profession' of the law and of the courts and their `judicial authority, requires that indignities * * * to judges, on account *Page 989 
of rulings made in court, be summarily dealt with.'"
We quote from R.C.L., Vol. 12, page 1034, par. 20, the following: "The purpose for which the grand jury is given such large inquisitorial powers is in order that it may find indictments against all public offenders; it exceeds its authority when instead of returning an indictment it makes a long recital of facts, tending to bring the complaining witness into contempt and disgrace and charging him with malice and improper conduct."
It is stated in Corpus Juris, Vol. 28, page 799: "Grand juries sometimes make a sort of general presentment of evils or evil things to call attention to them, yet not as instructions for any specific indictment. It has been held that a grand jury has no power to file with the court a report of this nature, charging no crime, but reflecting on the conduct of specified individuals. And a court may expunge such a report from the records where it appears to have been inadvisedly made, or is merely a guise to accuse a public official of laxity in the enforcement of certain laws."
From 28 Corpus Juris, p. 800, we quote: "Unless otherwise provided by statute an accusation in the nature of a presentment must have the concurrence of the same number of jurors that is required to find an indictment."
We have quoted copiously from authorities and the opinions of the highest courts of the various States, which are treated with the greatest respect throughout this *Page 990 
country, to show that the question with reference to the proper limit and control of the functions of Grand Juries is not a new one and has received considerable attention because of its great public importance.
Returning now to the law of our own State, the document which Powell and DeArmas, as grand jurors, tried to read without the Court's permission, certainly censured the District Attorney and his staff and charged them with incompetency, favoritism and misconduct in office, i.e., malfeasance and nonfeasance and they were deprived of an opportunity to defend their professional and personal reputations and good names. The action of the seven grand jurors in attempting to make such a report under the appellation of a request for assistance, does not take it out of the limitations and restrictions placed upon the power and authority of the members of the Grand Jury by Article 210 of the Louisiana Code of Criminal Procedure. If the District Attorney and the members of his staff were guilty of wrongdoing, which amounted to a criminal offense, it was the duty of the Grand Jury, based upon competent evidence, to indict them and it would have had the authority under the law to do so. If the alleged misconduct of the District Attorney and his staff did not constitute a crime but subjected them to removal from office, the power to remove them, under the law, has been entrusted to other public authorities and not to the grand jurors. Article IX, Section 6 of the Constitution of 1921 and Act No. 121 of 1921, Extra Session, amending Act No. 286 of 1914. If the *Page 991 
District Attorney and his staff were guilty of such misconduct and neglect of duty, which did not constitute a crime, nor a ground for their removal or impeachment, they might be superseded by the Attorney-General under the provisions of Act No. 24 of 1934, 1st Ex.Sess. In addition to these methods of dealing with public officials whose manner of conducting the duties of their offices is not satisfactory to the public, Act No. 121 of 1921, Ex.Sess., gives the qualified electors the right to petition for a recall election. However, we reiterate that the duties of the grand jurors and their power and authority have been restricted by Articles 206, 210 and 211 of the Code of Criminal Procedure of Louisiana and Section 42, Article VII of the Constitution of 1921, and therefore, the document entitled "Request to the Honorable Judge Platt for Assistance" was a type of finding, report or return which the Grand Jury was without authority and power to present to the court.
To hold that a majority of the grand jurors is authorized by law to make the kind of report which they tried to make in this case would be nothing short of the most flagrant type of judicial legislation, because the opinion of this Court holding that view would repeal the clear and definite legislative Act which establishes the public policy in this State with reference to the power and authority of grand jurors in the administration of justice, and would be, in effect, an outright repeal — particularly of Articles 210 and 211 of the Code of Criminal Procedure of this State, which restrict the types of reports that the Grand Juries can make, and Article 206 of the Code of *Page 992 
Criminal Procedure, which states that nine grand jurors shall constitute a quorum, as well as Section 42 of Article VII of the Constitution of 1921, which provides that "a grand jury [shall consist] of twelve, [members] nine of whom shall constitute aquorum and must concur to find an indictment." (Italics and brackets ours.)
Articles 310 and 311 of the Code of Criminal Procedure, dealing with the recusation of District Attorneys, reads as follows:
Art. 310. "Any district attorney shall be recused by the judge in criminal cases:
"First — If said district attorney be related to the party accused or to the party injured within the fourth degree, or be his father-in-law, or his son-in-law, or his brother-in-law, or be the husband of the accused or of the party injured;
"Second — If said district attorney shall have been employed or consulted as attorney for the accused before his election or appointment as district attorney;
"Third — If said district attorney shall have a personal interest adverse to that of the prosecution."
Art. 311. "In the event of the recusation, absence or disability of any district attorney, the district judge shall appoint a lawyer having the qualifications of a district attorney of said district to act in the place of said recused district attorney, during the time of his absence or disability; provided, that whenever the district judge shall, from any cause, be unable to make such appointment, he shall certify such fact in writing to the Attorney General, who shall then *Page 993 
designate and appoint a district attorney of another district to act in place of the regular district attorney."
Article 313 reads: "When, over the objection of the State, a ruling shall have been made recusing or refusing to recuse, the State shall have the right, before trial on the merits, and within the legal delay, to have such ruling reviewed; in appealable cases, by appeal; in unappealable cases, by a resort to the supervisory powers of the proper tribunal."
A reference to the provisions of the above Articles and the charge of nonfeasance and misfeasance against the District Attorney and his staff, contained in the written request of the seven grand jurors to the District Judge for assistance, shows that the alleged non-cooperation and misconduct of the District Attorney and his assistants do not come within the provisions of these Articles and, therefore, the District Judge was powerless, even if the request had been made by twelve members of the Grand Jury, to recuse the District Attorney and his staff. These charges, if proved to be true, might be sufficient reasons to justify the Attorney-General in superseding the District Attorney and his staff, or might be sufficient causes for the removal of the District Attorney from office, or for the recall of the District Attorney by the qualified electors, but such functions are in the province of others and not in charge of grand jurors and district judges.
This Court has held that a district judge cannot recuse a district attorney in a prosecution, because the district attorney is of *Page 994 
the opinion that no law has been violated; and where the district attorney voluntarily recused himself and the district judge appointed a special or acting district attorney, who filed the information, it was quashed for being unauthorized and, therefore, null and void, as the causes of recusation of the district attorney are limited and exclusive. State v. Boasberg,124 La. 289, 50 So. 162.
There is no substantial difference between the laws under which the above case arose (Acts No. 35 of 1877 1st Ex.Sess., and No. 74 of 1886) and the provisions of Articles 310 and 311 of our present Code of Criminal Procedure, in fact, they are practically identical.
The request that the District Judge appoint one of several named attorneys to replace the District Attorney and his staff as "Special District Attorney and adviser, to the Grand Jury, with power to appoint what assistants he may need," was also without legal sanction and neither the Grand Jury nor the Court could adopt and follow such procedure in replacing the District Attorney and his assistants.
Counsel for the relators have not referred us to any authority empowering the District Judge to appropriate $10,000, in order that the grand jurors might employ special investigators. There is no law authorizing the District Judge to make any such appropriation and, consequently, this request, like the others, is lacking in legal foundation.
It is suggested that, to deny the majority members of the Grand Jury the right to petition the Court for assistance in *Page 995 
the manner in which they sought to do — would be a deprivation of their constitutional rights under Article I of the Constitution of the United States, U.S.C.A., and Article I, Section 5, of the Constitution of this State, which, in substance provide that the people have the right to petition the Federal and State governments for redress of grievances.
It is not denied that the Legislature has the right to create the office of grand juror and to invest the members of the Grand Jury with certain powers and responsibilities and to limit their authority. The document in question was signed by the members of the Grand Jury — not as individuals or citizens, but in their official capacities as grand jurors and, therefore, since the Legislature in its wisdom has seen fit to restrict the kinds of returns, findings and reports that the grand jurors can make and the manner in which they shall be made, the grand jurors must respect and abide by this limitation and restriction upon their power and authority by the law. It is not claimed that the grand jurors, in their official capacities, were deprived of any constitutional rights and they are not appearing before this Court as individual citizens but as officials.
It would be difficult to imagine a court and a grand jury properly functioning and rendering fair and impartial justice where the grand jurors would openly flaunt and disregard the District Judge and the law in the manner in which these two grand jurors did. Their acts of contempt were so grievous, their fitness and qualifications as grand jurors were thereby affected *Page 996 
and, therefore, the District Judge was justified in removing them for "legal cause."
For the reasons assigned, the relief prayed for by the relators is denied at their costs.
ROGERS, J., concurs in the result.