LEANDER BRINK, Respondent, *v.* WILLIAM D. STRATTON et al.;
Appellants.

1. EVIDENCE — COMPETENCY OF FACTS SHOWING HOSTILITY OF WITNESS. Testimony of a party as to the hostility of witnesses called to impeach him is competent for the purpose of affecting their credibility.

2. RELIGIOUS BELIEF OF WITNESS. A witness cannot be interrogated as to his belief in the existence of a Supreme Being, who would punish false swearing, for the purpose of affecting his credibility.

*Brink* v. *Stratton*, 64 App. Div. 334, reversed.

(Argued June 16, 1903; decided October 6, 1903.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered October 17, 1901, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Abram F. Servin* and *Thomas Watts* for appellants. The court erred in refusing the testimony of Corey offered to show bias in witnesses called to impeach him. (*People* v. *Brooks*, 131 N. Y. 321; *Lamb* v. *Lamb*, 146 N. Y. 317; *Schultz* v. *T. Ave. R. R. Co.*, 89 N. Y. 242; *People* v. *Mather*, 4 Wend. 229.) The question allowed as to Corey's religious belief and the charge of the court upon that point were erroneous. (*Stanbro* v. *Hopkins*, 28 Barb. 265.)

*William Vanamee* and *John F. Bradner* for respondent. The rulings upon the testimony as to Corey's bad character were correct. (*Gale* v. *N. Y. C. & H. R. R. R. Co.*, 76 N. Y. 594.) The questions asked Corey as to his regard for the sanctity of an oath and the charge of the court upon this subject were proper. (*Stanbro* v. *Hopkins*, 28 Barb. 267; 1 Rice on Ev. 548, 549; *Free* v. *Buckingham*, 59 N. H. 225; *People* v. *Braun*, 158 N. Y. 569; *G. W. T. Co.* v. *Loomis*, 32 N. Y. 127; *LaBeau* v. *People*, 34 N. Y. 230.)

MARTIN, J. This action was to recover upon. a joint and several promissory note made by the defendants Stratton, Brown, and the firm of Corey & Co., of which Corey is surviving partner. It was payable to the plaintiff or his order. The defendants Stratton and Brown answered the complaint, and, among other defenses, alleged that the note in suit had been paid by the defendant Horace W. Corey or the firm of Corey & Co. The defendants' evidence was to the effect that it had been paid by giving another note made by Corey & Co. alone which was discounted at a bank, renewed from time to time, and ultimately taken up and paid by the plaintiff. That it was received in payment by the plaintiff was denied by him, and that issue was submitted to the jury which found a verdict in his favor. The judgment entered upon the verdict was unanimously affirmed by the Appellate Division, so that the only questions which are presented upon this appeal arise either upon rulings rejecting or admitting evidence, or, upon exceptions to the charge of the trial court.

The first error alleged by the appellants is the refusal of the court to permit the defendant Corey to testify as to the relations between himself and three witnesses, Stivers, Boyd and Wilbur, who were called on the trial to impeach his character for truth and veracity. As to the witness Stivers he was asked : " While you were publishing a paper and he was publishing one were you good friends ? [Objected to as improper. Objection sustained. Defendants except.] " As to the witness Boyd he was asked : " Was Mr. Boyd opposing you and you opposing Mr. Boyd for a number of years in your papers ? [Objected to as improper. Objection sustained. Defendants except.] Q. Each one attacking the other through the paper ? [Same objection, ruling and exception.] " As to the witness Wilbur he was asked : " What have been the relations between you and Mr. Wilbur ? [Objected to. Objection sustained. Defendants except.] Q. Was Mr. Arthur (Wilbur) at one time superintendent of schools ? A. He was. Q. Did your paper attack him ? [Objected to. Objection sustained. Exception.] Q. I will ask you whether or not by

reason of the position of the 'Forum' against Mr. Wilbur, whether or not he was defeated as superintendent of the schools? [Objected to. Objection sustained. Exception.]"

That it was competent to prove the hostility of any or all of these witnesses towards the defendants or either of them by their cross-examination or by other testimony; that it was not necessary that the witness should be first examined as to his hostility before calling other witnesses, and that the examination of other witnesses is not limited to contradicting him in case he denies hostility, is well established by the decisions in this State. (*Starks* v. *People*, 5 Denio, 106; *People* v. *Brooks*, 131 N. Y. 321; *Garnsey* v. *Rhodes*, 138 N. Y. 461, 467; *People* v. *Webster*, 139 N. Y. 73, 85; *Lamb* v. *Lamb*, 146 N. Y. 317.)

In *People* v. *Brooks* it was held that the hostility of a witness towards a party against whom he is called may be proved by any competent evidence, either by cross-examination of the witness or by the testimony of other witnesses; and that it is not necessary that the witness should first be examined as to his hostility before calling other witnesses, and the examination of other witnesses is not limited to contradicting him in case he denies any hostility. The extent, however, to which an examination may go for the purpose of proving the hostility of a witness must be, to some extent, at least, within the discretion of the trial judge. It should be direct and positive, and not very remote and uncertain, for the reason that the trial of the main issue in the case cannot be properly suspended to make out a case of hostile feeling by mere circumstantial evidence from which such hostility or malice may, or may not, be inferred. (*Schultz* v. *Third Ave. R. R. Co.*, 89 N. Y. 242.) The decision in the *Brooks* case was followed in *Garnsey* v. *Rhodes*, *People* v. *Webster* and *Lamb* v. *Lamb*.

In the *Garnsey* case a witness was asked whether there had been any disagreement between him and the plaintiff's architects, between whom and the plaintiff a conspiracy was alleged. The evidence was objected to and excluded. This was held error and the court there said: "The object of the defense

was to charge the plaintiff with the consequences of a con-
spiracy between him and the architects, and it was, therefore,
quite as material and important for the plaintiff to show that
the witness by whom it was sought to establish the unlawful
combination was hostile to one of the parties to it as it would
have been to have shown hostility on his part towards the
plaintiff himself.  The admission or rejection of the evidence
was not discretionary with the trial court."  "It was not
there (in *People* v. *Brooks*) held, as the counsel for the
defendant seems to suggest, that it was in the discretion of
the court, whether such questions should be allowed.  All
that was said upon the point was that the *extent* to which
such an examination may go must be in some measure within
the discretion of the trial judge.  This must be so or else it
might become interminable.  But here the whole inquiry was
ruled out.  Even general questions were disallowed, and, as
it must be assumed, for the purposes of this appeal, that if
answered, the responses would have shown bias, the plaintiff
may have been prejudiced by the exclusion of the evidence."
If Corey is to be regarded as a party to this action, then
clearly within the doctrine of that case the evidence offered
by the defendants as to the relations between Corey and the
witnesses called was admissible.  It will be remembered that
the witness was asked as to Stivers whether he and Stivers
were good friends while publishing opposition papers.  As to
Boyd the inquiry was if they were opposing each other for a
number of years in their papers, and as to Wilbur he was
asked what had been the relations between them.  All these
questions were objected to as improper and the objection was
sustained.  Corey was named as defendant in the summons
and complaint, but did not appear either in person or by
attorney.  He was, however, called as a witness by the
defendants and gave material testimony upon the trial.  The
three witnesses mentioned were called to impeach his charac-
ter for truth and veracity and testified that it was bad.  Corey
was then recalled and the proof as to the hostility of those
witnesses to him was offered and excluded.  Thus the ques-

tion presented is whether the defendants were entitled to prove the relations between those witnesses and Corey as affecting their evidence as to his general character. We think they were. The question of his character was thus placed in direct issue. To that issue the evidence rejected was plainly directed, and the proof offered was admissible within the principle of the cases already cited, especially the cases of *Starks* v. *People* (5 Denio, 106), where it was held that a party has a right to impeach a witness for his adversary, though the testimony of such witness related solely to the general character of another witness, and *Garnsey* v. *Rhodes*, where the hostility which was sought to be proved was between the architects employed by the plaintiff and the principal witness for the defense. In this case the direct purpose of the evidence was to show that the witnesses who had testified to the bad character of Corey were hostile to him, the party against whom they had testified, and, hence, their evidence was not entitled to the credit it otherwise would have been and was, we think, plainly admissible.

The next exception urged by the appellants is to the rulings of the court rejecting the evidence of the defendant Corey as to whether he was financially responsible at the time the note which was put in the bank was delivered to the plaintiff. The issue was whether the note in suit had been paid by the delivery and acceptance of a note made by Corey & Co. That question in the case depended upon the direct evidence of the parties, and even if the defendant Corey was financially responsible, it is hardly evidence that the plaintiff would have surrendered a note upon which there were two other makers who were responsible, even if the defendant Corey was. We think this exception is insufficient to justify an interference with the judgment.

The only remaining exceptions that need be considered are whether the court properly overruled the defendants' objection to the plaintiff's question whether the witness Corey believed in the existence of a Supreme Being who will punish false swearing, and to the charge of the court upon that

evidence. The question was objected to as improper, immaterial and irrelevant. The objection was overruled and the defendants excepted. The answer was: "I do not know anything about it I am sure., * * * I will reply that I am an agnostic. I have no belief on that subject at all. I do not know anything about it." The court .in charging the jury said: "It is for you to say how far you are to attach credibility to his (Corey's) statements, how far his testimony is impeached as to what he has said here in regard to his religious beliefs." This charge was excepted to by the defendants. That question is not an open one in this court. In *People* v. *Most* (128 N. Y. 108) it was directly involved and distinctly decided. One of the points made by the appellant's counsel in this court was that " The court erred in permitting the district attorney to interrogate each witness for the defense as to his religious belief, and in not stopping the district attorney in his summing up to the jury when he said that the jury should not believe the defendant and his witnesses because some of them testified that they did not believe in the Supreme Being." At the threshold of his opinion in that case Judge Andrews stated that "But three of the questions presented on the brief of the appellant's counsel can be considered on this appeal. One of these questions is raised by the exception to the denial by the trial judge of the motion of the counsel for the defendant, made at the conclusion of the evidence on the part of the People, for an instruction to the jury to acquit the defendant on the ground that the evidence was legally insufficient to justify a conviction. An exception was taken to a question put to a witness by the defendant on cross-examination by the prosecuting officer and which was allowed by the court, as to his belief in a Supreme Being. A third exception was taken to evidence offered by the prosecution and admitted, that the persons present at the meeting at Kramer's Hall on the evening of November 12, 1887, were anarchists."

After discussing the first and third questions the court held that the evidence was sufficient to bring the case within the defi-

nition of the statute, and that the proof that the persons present at the meeting at Kramer' Hall were anarchists, was properly admitted. As to the second exception, which was to the question as to the witness' belief in a Supreme Being, the court said : " The exception to the question put to the witness on cross-examination as to his belief in a Supreme Being is frivolous." Thus it is perfectly manifest that the question whether it was competent to interrogate a witness as to his belief in a Supreme Being was directly involved and squarely decided by this court in that case. It is also manifest that if a contrary view had been taken upon that question, which was certainly presented, it would have required a reversal of the judgment, and, as the judgment was unanimously affirmed, it is plain that the question was passed upon in that case. Therefore, unless our decision in that case is to be overruled, the judgment in this case cannot be reversed upon that ground.

We are, however, of the opinion that the court erred in rejecting the evidence of the witness Corey as to the hostility of the impeaching witnesses, and for that error alone the judgment should be reversed.

CULLEN, J. I concur in the opinion of Judge MARTIN that the trial court erred in not permitting the defendant, when examined as a witness on his own behalf, to testify as to the state of the relations existing between himself and several witnesses for the plaintiff. But there was further error committed on the trial. On cross-examination the defendant Corey was asked, against the objection and exception of his counsel, whether he believed in the existence of a Supreme Being who would punish false swearing, to which he replied that he knew nothing about it; that he was an agnostic and had no belief on the subject at all. In submitting the case to the jury the learned County Court charged : " It is for you to say how far you are to attach credibility to his (Corey's) statements, how far his testimony is impeached as to what he has said here in regard to his religious beliefs," to which comment

and instruction the appellants excepted. I think that these rulings also were erroneous.

At common law no one but a Christian was a competent witness, and, as testimony could be given only under the sanction of an oath, even Christians (such as Friends and others) who deemed the taking of an oath unlawful were necessarily excluded from testifying. The common-law rule was relaxed from time to time, either by statute or by judicial decisions, until as the law stood in this state prior to the adoption of the Constitution of 1846 : " Every person believing in the existence of a Supreme Being who will punish false swearing, shall be admitted to be sworn, if otherwise competent." (2 R. S. 408, § 87.) And it was further enacted by the legislature that " no person shall be required to declare his belief in the existence of a Supreme Being, or that he will punish false swearing, or his belief or disbelief of any other matter, as requisite to his admission to be sworn or to testify in any case. But the belief or unbelief of every person offered as a witness may be proved by other and competent testimony." (Id. 408, § 88.) It was immaterial whether the witness believed that Divine punishment would be inflicted in this world or in the next. (1 Greenl. Ev. § 369.) Though it seems that prior to the legislation referred to the rule was to the contrary and it was necessary that the witness believe in a future state of rewards and punishments. (*Jackson* v. *Gridley*, 18 Johns. 98 ; *Butts* v. *Swartwood*, 2 Cowen, 431.) But by the Constitution of 1846 there was added to the previously existing constitutional declaration of religious liberty the further provision : " And no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief." This amendment, of course, established the competency of an infidel or an atheist as a witness. As to this there is no dispute. But it is contended that though the witness may not be excluded from testifying by reason of being an infidel, he may be interrogated as to his belief, and his infidelity be considered by the jury on the question of his credibility. This was so held by the Supreme Court in *Stanbro* v. *Hopkins*

(28 Barb. 265), though the declaration was obiter, the judgment having been reversed on another point. The same view was taken by this court without discussion in *People* v. *Most* (128 N. Y. 108). The question has arisen in other states. In Iowa the rule in the *Stanbro* case seems to have been adopted. (*Searcy* v. *Miller*, 57 Iowa, 613; *Stole* v. *Elliott*, 45 id. 486.) On the other hand, in Virginia and in Kentucky, under constitutional provisions not as explicit as our own, but enacting liberty and equality of religious belief, it has been held that a witness cannot be interrogated as to his belief in the existence of a Deity or a future state for the purpose of affecting his credibility. (*Perry* v. *Commonwealth*, 3 Grattan, 632; *Bush* v. *Commonwealth*, 80 Ky. 244.)

The record of the proceedings of the convention by which this constitutional provision was formulated shows that the view taken by the Virginia and Kentucky courts is the correct one. The provision was the subject of discussion and debate and was not adopted without opposition. The member who introduced the provision (Mr. Taggart, of Genesee) said that he had known the question of a witness's belief in a Supreme Being being raised but once, and trusted that he should never see it raised again. But, he said, if there was anything in this, "let it go to the jury; let it go to his credit and not to his competency." Acting on this suggestion another member moved an amendment: "But evidence may be given as to the belief or disbelief of the witness in the obligation of an oath and of the grounds of such belief or disbelief, in order to enable the jury to judge of his credibility." This amendment was rejected by a vote of 92 to 12. (Crosswell & Sutton Debates, pp. 808, 809.) It may be worthy of notice that the convention at the same time struck out the provision of the then existing Constitution which disqualified ministers from holding office, thus making the divorce between the state and religious creeds complete.

Therefore, upon the adoption of the Constitution of 1846 by the people, a witness could not be excluded by reason of his religious belief or unbelief, nor under the statute

could he be interrogated on that subject. The learned court in the *Stanbro* case said with entire truth that though a witness may be competent his credibility may be impaired. It then argued that in analogy to the case of a party to an action who is now a competent witness, but whose interest in the cause goes to his credibility, so the religious belief of a witness, while not rendering him incompetent, might be considered on the question of the credit to be accorded him. I think the learned court was misled by a false analogy. Interest in the subject-matter and relationship to the parties are temporal and mundane influences which common experience teaches us tend to bias consciously or unconsciously the testimony of witnesses. But such is not naturally the result of abstract religious belief. I think that the decision of this court in *Gibson* v. *Am. Mutual Life Ins. Co.* (37 N. Y. 580) is controlling on that question. That was an action on a life insurance policy, one of the defenses being suicide. Evidence offered by the defendant to show that the insured was an atheist was excluded. The ruling of the trial court was upheld on the ground that a man's probable course of action could not be predicated from his religious belief. It was there said by Judge HUNT: " In what way, and how far do these statements of belief operate upon the conduct of man? Is it certain that he who believes in the eternal punishment of the impenitent, in a future world, is a better observer of the laws of his country, and more free from actual crime, than he who denies that doctrine? Or is it certain that he who believes in the final salvation of all men would refrain from an offense which he would have committed had he believed that there was no future state? No man can answer with certainty." The truth of this statement is apparent when it is borne in mind that at all times men have been found to unfalteringly meet death rather than deny their religious faith, who could not be induced to conform their lives to the commands of that religion for a week continuously. All that was written by Judge HUNT in the case cited applies with far more force to the case before us. The light

in which suicide was viewed by Pagan ethics differs widely
from the judgment passed on that act by the Christian
religion.    While there were not wanting philosophers or
moralists in the old world to condemn the act, they were
the exceptions.    But the Christian religion declared that
suicide was a "mortal" sin, and there can be no doubt that
it is due to belief in that religion that a practice once
common has substantially ceased, though sporadic instances
still occur.    (See 1 Lecky European Morals, 233 *et seq.*)
Indeed, one of the grounds of attack on Christianity by
the great apostle of modern pessimism is what he con-
tends to be its false view of suicide.    (Schopenhauer's Essays.)
The argument was, therefore, not without force, that an infi-
del or an atheist would be more likely to commit suicide than
a Christian.    But I know of no system of religion or code of
ethics at any time generally prevalent in the world that has
failed to condemn falsehood or to hold truth as a virtue.

It has been seen  that in the condition of the law just prior
to 1846 the only religious view that excluded a witness was
failure to believe in Divine punishment.    Thus fear was
deemed the only influence by which veracity in witnesses
could be assured.    If, despite the constitutional enactment
that no such test of competency shall longer prevail, inquiry
on the subject is still to be made with reference to the wit-
ness' credibility, I think we may be led into great embarrass-
ments.   I do not  see why a witness who declares  merely his
ignorance as to whether there is or is not a Deity who will
punish false swearing is less amenable to fear than one who
believes that his future state, whether of  salvation or punish-
ment, has been decreed from all eternity regardless of faith or
good works.    Yet the denomination holding this doctrine in
its confession of faith  has  given  to  American  history  at
least as many great names as any other religious sect.    I think
that the learned court in the *Stanbro* case failed to appre-
ciate that when the Constitution abrogated all disqualifications
from office or civil rights, the consideration of a witness's relig-
ious belief on the question of his credibility necessarily fell at

the same time.    On the trial of a cause, as is pointed out by
the Supreme Court of Virginia, the judge may be a skeptic
or an infidel and the juror an agnostic or an atheist; neither
can be excluded for that reason from sitting in judgment.    Is
it possible that we would uphold the submission to a jury of
a witness's belief in Christianity as impairing his credibility?

It is said by one of the learned judges in the *Stanbro* case
with reference to the practice of interrogating a witness as to
his religious belief: " I have no fears that this rule will encour-
age parties to scandalize truly religious witnesses by imputa-
tions that they profess the worst of creeds.    For so long as no
religious test shall be required for judges and jurors, parties
will be loath to cross-examine witnesses as to their opinions on
matters of religious belief unless they are well assured the
opinions of the witnesses are very obnoxious to the sentiments
of citizens who say with Pope:

> ' For modes of faith let graceless zealots fight,
> He can't be wrong whose life is in the right.' "

That which the learned judge considered a safeguard against
the abuse of the practice, to me constitutes its danger.
Doubtless, no wise advocate will interrogate a witness as to his
religious faith unless it is obnoxious and unpopular in the
community.    But that is the very case in which the exposure
of a witness's religious belief would probably lead to injustice.
It is somewhat singular that shortly after the adoption of the
Constitution of 1846 abolishing all religious tests or disqualifi-
cations, religious animosities, it is true not standing alone, but
connected with questions of race and nationality, reached the
highest pitch ever known in this country, not only affecting
the action of political parties, but leading in many cases to
riot and the destruction of property.    I think that no one who
remembers that period will deny that during the prevailing
prejudice and passion a witness professing the unpopular faith
might have found himself, in some parts of the country, as much
discredited by a jury, or some members of it, as an agnostic
or atheist would now be.    It is true that the feelings then
existing have entirely or almost entirely subsided.    It is also

true, as said by Bacon, that a religion of negation only is not apt to draw to itself many or enthusiastic adherents, and it may be added that for this reason it is not likely to excite the most violent antipathies. But the principle involved here is in itself important, and the rule declared by the court, in my judgment, wrong. Unfortunately, religious animosities are easily aroused, and we should not give sanction to a principle that may hereafter work great injustice.

I do not say that no examination into a witness's religion can at any time be had. The religious creed of a person may not deal exclusively with his relations to his Creator, but may enjoin acts forbidden by law or forbid compliance with the law. The weight of authority seems to be that the Thugs in India committed their crimes under the direct sanction if not command of their religion. Of course, a witness may be interrogated as to whether he thinks it wrong to give false testimony, whether his religion requires him to commit a crime. These inquiries relate to temporal matters, not to spiritual or theological ones. So also a witness may be asked whether he is a member of the same church as that of one of the parties. This also involves no direct inquiry into his religious belief, but only as to his associations. Experience teaches us that we may be biased in favor of our associates, whether in a church, in a club or in a business institution. Possibly the most "obnoxious" religious faith to-day is that of the Mormons. In a prosecution for polygamy a witness might properly be asked whether he was a Mormon, and whether his religion did not enjoin or, at least, approve that practice. But when a Mormon sues on a bill for groceries, in my judgment it is neither constitutional nor reasonable to interrogate him on the subject of his belief for the purpose of exciting prejudice against him.

The judgment appealed from should be reversed and a new trial granted, costs to abide the event.

Bartlett, Haight, Vann and Werner, JJ., concur with Cullen, J., who agrees with Martin, J., as to ground for reversal; Parker, C. J., concurs with Martin, J., fully.

Judgment reversed, etc.