**Application of UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA et al.**

United States District Court
S. D. New York.
April 13, 1953.

Myles J. Lane, U. S. Atty., S. D. New York, New York City, Robert Martin, Asst. U. S. Atty., New York City, of counsel, for the United States, appearing as amicus curiae.

David Scribner, New York City, general counsel and attorney for UE, and attorney for Albert J. Fitzgerald, Julius Emspak and James J. Matles, petitioners.

Victor Rabinowitz, New York City, for petitioner Joseph P. Selly.

WEINFELD, District Judge.

This is a motion to expunge from the records of this Court a "presentment" issued by a Grand Jury of this district on November 25, 1952, and to strike the names of its members from the jury rolls on the ground of misconduct in handing up said "presentment," and in other respects.

The basis of the motion is that

(1) The "presentment" disclosed matters occurring before the Grand Jury in violation of the oath of secrecy administered to its members and also in violation

of § 6(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.;

(2) The "presentment" constitutes a statement on a subject over which the Grand Jury had no jurisdiction; and

(3) The Grand Jurors violated the rights of the individual petitioners in that their religious beliefs and practices were inquired into under threat of punishment for contempt for failure to answer.

Petitioners are the United Electrical, Radio & Machine Workers of America (hereafter referred to as UE), its President, its Director of Organization and its General Secretary, and the President of the American Communications Association (hereafter referred to as ACA), individually and on behalf of ACA.[1]

The grand jury in question is the October 1952 Grand Jury. It handed up the so-called "presentment" in the Criminal Motion Part.

This document recites that the Grand Jury had considered possible violations of the conspiracy and perjury laws with reference to the non-Communist affidavits executed "by various leaders of unaffiliated unions" and filed with the National Labor Relations Board under § 9(h) of the Taft-Hartley law; that it had "received evidence to the effect that a number of responsible officials of some unaffiliated unions have long histories of Communist membership and activity"; that after the receipt of such evidence it subpoenaed thirteen officials who were "responsible officers" of UE, the ACA and two other unions; that these unnamed officials invoked their privilege against self-incrimination when asked about the non-Communist affidavits they had filed; that because of the refusal to affirm whether the affidavits are true or false, they are not "worth the paper they are written on"; that the filing of such affidavits was a "subterfuge"; that there was "obvious non-compliance" with § 9(h) of the Labor Management Relations Act.[2] And, finally, the Grand Jury recommends that the National Labor Relations Board (hereafter referred to as the NLRB) revoke the certification of the unions involved and that consideration be given to including in each non-Communist affidavit a waiver by the signer of his Fifth Amendment privilege. No indictment was returned against any person charging perjury or any other crime.

A copy of the document was forwarded to the NLRB, and subsequently, at its request, the names of the thirteen union officials who testified also were forwarded to it, pursuant to an order of authorization. Thereafter an application, similar to the present one, was made before the Judge sitting in the Criminal Motion Part, who denied the application without prejudice to a renewal before the Judge to whom the "presentment" had been handed.[3] The present motion followed. A notice of motion was served on both the Foreman of the Grand Jury and the United States Attorney. The latter appears in this proceeding in the role of amicus curiae.

Pending the submission of briefs by the petitioners and the Assistant United States Attorney, the NLRB, with Chairman Herzog dissenting, issued a notice and order, directing the individual petitioners to answer a questionnaire asking them to affirm the truth of the non-Communist affidavits previously filed by them. The notice also stated that failure to file answers would result in a declaration by the Board that the union was not in compliance with the requirements of § 9(h) of the Act. It is conceded that the order was provoked solely by the document which the Grand Jury had issued.[4] On January 27, 1953, however, the NLRB was permanently en-

---

1. Of the four individual petitioners, only three testified before the grand jury.

2. 29 U.S.C.A. § 159(h).

3. In re United Electrical, Radio & Machine Workers of America [In re October, 1952 Grand Jury], D.C., 109 F.Supp. 92.

4. Counsel for the Board upon the injunction hearing acknowledged that, except for the "presentment," it had no other information to cast doubt upon the compliance status of the union.

joined from ordering officials of three unions, two of whom are petitioners UE and ACA, to reaffirm their non-Communist oaths.[5]

### I. Standing

At the threshhold of inquiry, the government attacks the right of petitioners to apply for relief. As amicus curiae, it urges that petitioners have no standing to make this application because the class referred to in the "presentment"—that is, "thirteen of these union officials" who were "responsible officers,"—is too broad to sustain a finding of injury to individual petitioners.[6] As to the four unions named in the "presentment," it is urged that they have been accused of no wrongdoing—that their mention is purely incidental to the reference to some of their officers.

Although the "presentment" does not name the individual petitioners, it does name the unions of which they are officers. It recites that the affidavits of thirteen officials of the four named unions are "not worth the paper they are written on," are "meaningless," and were a "subterfuge."

On the day on which the document was handed to the Court and on successive days thereafter, the metropolitan press and newspapers throughout the country printed portions of it, and included in the articles were the names of the thirteen union officials who had testified before the Grand Jury, among whom were the petitioners. The inference was unmistakable that these were the very officials referred to in the document as having filed worthless affidavits.

The charge is made, and remains undenied, that the information was furnished to the press by the Foreman of the Grand Jury and the Special Assistant to the Attorney General and the United States Attorney for this district. The allegations in the answering affidavit of an Assistant United States Attorney, made upon information and belief, that the Grand Jury "did not authorize any person to reveal the names of the thirteen union officials to which it made reference in the presentment and that no action was taken by any member of the Grand Jury in his official capacity" hardly meets the charge.

I am persuaded that the thirteen names were deliberately leaked, whether "officially" or "unofficially," to the newspapers with the intent that they were to be included in the news reports of the "presentment." The government urges that the "presentment" should not be amenable to attack just because there may have been a leak. This view overlooks the realities of modern day publicity. In practical terms, the result achieved was the same as if the "presentment" had identified each of the thirteen union officials. Hence, it will be so treated.

■ In effect, the individual petitioners are accused of filing false affidavits. And the accusation, coming as it does, from a quasi-judicial body which occupies a position of respect and dignity in the community, carries greater weight than a similar charge from a private person.[7] The wide-spread publication of the charges and the identification of petitioners as the offenders subjected them to public censure to the same degree as if they had formally been accused of perjury or conspiracy. At the same time it deprived them of the right to defend themselves and to have their day in a Court of Justice—their absolute right had the Grand Jury returned an indictment. What greater interest can an individual have than to protect his name and defend himself against accusation of crime?

■ I think also that a clear case of

---

5. United Electrical, Radio & Machine Workers v. Herzog, D.C., 110 F.Supp. 220.

6. But, see, as to specificity, In re Wilcox, 153 Misc. 761, 276 N.Y.S. 117, 120–121, where a report referring to "inspectors of election in each district of the Fourth Ward" was expunged upon petition of an unnamed member of that class. A similar result was reached in In re Osborne, 68 Misc. 597, 125 N.Y.S. 313, 314, where the report referred to "representatives of the Attorney General."

7. See In re Osborne, 68 Misc. 597, 125 N.Y.S. 313, 318; In re Funston, 133 Misc. 620, 233 N.Y.S. 81, 85.

standing has been made out by the petitioner-unions. The "presentment" had a direct and swift impact upon them. Up to the return of the "presentment" they had been certified as in compliance with the requirements of the Labor Management Relations Act, their officers, including some of the petitioners, having filed non-Communist affidavits for the years 1949, 1950, 1951 and 1952. As a direct result of the "presentment," and only because of it, the Board on December 19, 1952, directed the officers of the four unions named in the "presentment" to file additional affidavits reaffirming their prior sworn statements, under penalty of decertification upon failure to do so. Only court action stayed the Board. But already damaging consequences affecting the unions had followed in the wake of the "presentment."

One of the unions was advised: that it would not be certified as the collective bargaining agent of an appropriate unit, although it had won the election; that complaints upon charges of unfair labor practices filed by the union would not be issued pending action in respect to the Board's notice and order of December 1952; and that, until compliance therewith, the Board would refrain from issuing a decision in a current appeal by the said union from a ruling of the Board's Regional Director of the 13th Region, the issues of which involved the substantial rights of the membership. Thus, notwithstanding the union's prior and unquestioned recognition by the NLRB as the collective bargaining agent of thousands of its members, the "presentment" stimulated Board action, imperilling the union's status. Moreover, rival unions have used the "presentment" in elections in which petitioner-unions were candidates for collective bargaining representative to cast doubt upon their continuing capacity to be eligible for certification. In one instance, an employer, relying upon the "presentment," asked the NLRB to strike one of the unions named therein from the ballot. Little distinction exists in the public mind as to the difference between "presentment" or "report" and an "indictment," and evidence has been submitted on this motion that a number of those who opposed the unions have assumed that an indictment had been returned. Under the circumstances it is clear that the unions and their membership have an important stake in the present application and are directly concerned with its outcome.[8]

■ Separate and apart from the issue of standing in the strict legal sense, I should still dispose of the application upon the merits. For it raises questions as to the powers of the Grand Jury and violations of Court rules which could not be decided except in circumstances analogous to those existing here. I may put the case in this posture: that violations of rules of this Court have been brought to my attention; that I choose to hear those who have raised these questions because they have shown that the alleged violations have injured them; and that it is my responsibility, since the matter has finally come to me, to correct such violations where they exist.[9]

"It [the grand jury] is under control by the court to the extent that it is organized and the legality of its proceedings determined by the court in accord with the statutes. Its members are subject to the court's supervision and control for any violation of their duties."[10]

■ The limitation on jurisdiction to "cases and controversies" was not intended to bar a court from exercising its inherent power to preserve the integrity of its records or to correct the action of

8. Cf. Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 139–141, 159–160, 71 S.Ct. 624, 95 L.Ed. 817.

9. See Matter of Jones, 181 N.Y. 389, 392, 74 N.E. 226 ["Such a motion does not involve a legal right of an individual, but the right of the court itself to keep its own records free from matters of an immaterial or improper character"]; In re Crosby, 126 Misc. 250, 213 N.Y.S. 86, 89.

10. Application of Texas Co., D.C., 27 F. Supp. 847, 850.

one of its appendages where such action constitutes a violation of court rules or is in excess of its powers.

Accordingly, I hold that the Court has jurisdiction to consider and determine the validity of the "presentment" herein.

## II. The Presentment

In approaching our problem it is well to bear in mind the two essential functions of the Grand Jury as it came to us in colonial days and as understood at the time of the adoption of the Federal Constitution.[11] One was to accuse those believed to have violated the laws and to bring them to trial. The other, equally important and sometimes overlooked in this modern day, was to protect the citizen against unfounded accusation of crime, whether by public officials or by private citizens.[12]

It should be noted that the document which the October 1952 Grand Jury handed up is not, strictly speaking, a "presentment," since it does not accuse

with the intent that anyone should be put to trial.[13] It is a report based upon testimony received by the Grand Jury from witnesses whose attendance was compelled by subpoena. It states "that there is no justification for continuing the certification" of the unions concerned, and concludes with recommendations both to the executive branch of the government and to the Congress. The executive is urged to "revoke the certification." The legislature is asked to consider an amendment to the Taft-Hartley Act, requiring union officials signing the non-Communist oath to waive their constitutional protection against self-incrimination with reference to oaths filed by them. In the view I take of the case, this action was not permissible.

The doctrine of separation of powers is basic to our Constitutional scheme.

"The Constitution allots the nation's judicial power to the federal courts. Unless these courts respect the limits of that unique authority, they intrude

---

11. See, e. g., Hale v. Henkel, 201 U.S. 43, 59, 26 S.Ct. 370, 50 L.Ed. 652; Ex parte Bain, 121 U.S. 1, 10–12, 7 S.Ct. 781, 30 L.Ed. 849; Charge to the Grand Jury, 12 F.R.D. 495, 496. For comment contemporaneous with, or shortly after, the passage of the Fifth Amendment to the Federal Constitution, see Debates of the Convention of the Commonwealth of Massachusetts, II Elliot's Debates 110; Somers, The Security of Englishmen's Lives (1798 Ed.); II Kent's Commentaries 11, classifying the grand jury under the Right of Personal Security; 3 Story's Commentaries on the Constitution of the United States 657, stating the importance of the grand jury as securing citizens against vindictive prosecutions; Addison's Reports, Charges to the Grand Jury 18, 36–42, 71–75; Fourth Report of the Commissioners on Practice and Pleading (N.Y.) XXXV.

12. Because of the conclusion I have reached, it is not necessary to decide whether the pre-Fifth Amendment common law grand jury had the power to issue specific reports. There appears to be substantial unanimity that it had the power to issue reports touching upon general conditions. However, on the issue of its power to make specific reports censuring individuals, there is a conflict of opinion. Some authorities have tak-

en the view that the grand jury did not have such power. See, e. g., In re Report of Grand Jury of Baltimore, 152 Md. 616, 137 A. 370, 372–373; Poston v. Washington, A. & Mt. V. R. Co., 36 App.D.C. 359, 367–369, 32 L.R.A.,N.S., 785; Medalie, 7 Panel 5. But there is authority to the contrary. See, e. g., I Webb, English Local Government: The Manor and the Borough; IV Holdsworth, A History of English Law 144–148; X, id. 146–150; Goebel & Naughton Law Enforcement in Colonial New York 343–365; Scott, Criminal Law in Colonial Virginia 70–71.

13. Both presentments and indictments are specific accusations of crime which are presented to the Court. An indictment is an accusation, usually prepared by the prosecutor, which is endorsed by the grand jury when it finds a "true bill." A presentment is an accusation, initiated by the grand jury itself, and may be regarded as instructions for an indictment. See Dession and Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L.J. 687, 705; 38 Columbia L.Rev. 1493, 1497. Proceeding by way of presentment is now obsolete, at least in Federal jurisdictions. See Rules 6 and 7 of the Federal Rules of Criminal Procedure and the Notes of the Advisory Committee, 18 U.S.C.A., p. 140.

upon powers vested in the legislative or executive branches. Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues between litigants, capable of effective determination. Judicial exposition upon political proposals is permissible only when necessary to decide definite issues between litigants. When the courts act continually within these constitutionally imposed boundaries of their power, their ability to perform their function as a balance for the people's protection against abuse of power by other branches of government remains unimpaired. Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches. By these mutual checks and balances by and between the branches of government, democracy undertakes to preserve the liberties of the people from excessive concentrations of authority." [14]

■ This statement summarizes a principle that has been at the heart of the judicial system from our earliest days as a nation governed by a Constitution. From the time the Justices of the Supreme Court declined to advise President Washington at his request [15] down to the present, the Federal Judiciary has declared itself without power to give advisory opinions. [16] Its members hold tenure during good behavior; they are removed from the arena of political controversy and are relatively insulated from criticism. A fundamental purpose of the Founding Fathers was to confine the courts to the performance of their judicial duties and thus to secure the fair and impartial administration of the laws.

■ The effectiveness of laws and the quality of their enforcement by administrative agencies are matters for the Chief Executive and the Congress. Where existing laws seem to be inadequate or to require strengthening, the wisdom of remedial legislation rests with the legislature and involves political judgment. Here, the courts may not intrude.

■ The Federal Grand Jury is an appendage of the court, within whose jurisdiction it sits. [17] As such its jurisdiction is coextensive with the court's and cannot exceed it. [18] And if the court is without power to advise the legislative and executive branches, so is the Grand Jury.

■ It may be said that the Grand Jury's function is to determine whether there is enough evidence before it to support the charge of crime and so to create a "case or controversy" which then must be turned over to the court for trial and final determination. If there is, the Grand Jury returns an indictment; if there is not, it remains silent. Once having determined that the evidence is insufficient, its function ends. It may not then issue a report based upon information derived during the course

14. United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 90–91, 67 S.Ct. 556, 564, 91 L.Ed. 754.

15. See Frankfurter and Shulman, Cases on Federal Jurisdiction and Procedure, Rev.Ed.(1937), footnote 1, 36–38. See also Hayburn's Case, 1792, 2 Dall. 409, 1 L.Ed. 436, decided the year before the letter of the Justices was written.

16. Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 111–114, 68 S.Ct. 431, 92 L.Ed. 568; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345–346, 56 S.Ct. 466, 80 L.Ed. 688 (Justice Brandeis, concurring); Keller v. Potomac Elec. Co., 261 U.S. 428, 444, 43 S.Ct. 445, 67 L.Ed. 731; Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246; United States v. Evans, 213 U.S. 297, 300–301, 29 S.Ct. 507, 53 L.Ed. 803; Gordon v. United States, 117 U.S. 697, 699–706.

17. See In re Black, 2 Cir., 47 F.2d 542, 544; United States v. Hill, 26 Fed.Cas. 315, No. 15,364; In re National Window Glass Workers, D.C., 287 F. 219, 225; United States v. Smyth, D.C., 104 F. Supp. 283, 291–292; United States v. Providence Tribune Co., D.C., 241 F. 524, 525.

18. United States v. Hill, 26 Fed.Cas. 315, 317, No. 15,364.

of its secret inquiry, directed to the executive and legislative branches, which touches upon matters within their exclusive authority. The Grand Jurors, like the members of the judiciary, are not accountable to an electorate.[19] Their hearings, being secret, are not amenable to informed evaluation by the public and are unsuited to make the determinations which our Constitution has allotted to the executive and the legislature.

■■ The right and duty of citizens acting in their individual capacities to criticize, to urge action and make recommendations to the other branches of the government is unquestioned and not at issue. But here, the full weight and authority of the Grand Jury as an official agency of the Court, through disclosure of testimony compelled by the Court's processes, has advised the executive (the NLRB) and Congress what action they should take on matters of substantive policy. It is at this point that the doctrine of separation of powers comes into play and requires the judiciary or its arm to maintain the purity of its function and to avoid the assumption of an advisory role.

One may well ponder the result if each of the Grand Juries in the eighty-six Federal districts returned recommendations to the legislature and executive as to the conduct of their affairs. The circumstances of this case are particularly instructive, for the Grand Jury undertook to advise the other branches of government in a controversial and "delicate field," [20] the subject of continuing Congressional inquiry. Its advice to the NLRB impelled action which was subsequently stayed by the courts as beyond the NLRB's power. Thus, the Grand Jury succeeded in involving that agency in unauthorized action. Its advice to the Congress concerned the waiver of a constitutional privilege by members of a group as a condition of using the facilities of the Board for those whom they repre-

sent—posing an involved constitutional question. The issues raised by the Grand Jury as to the non-Communist affidavit provision contained in § 9(h) of the Taft-Hartley Act and its effective enforcement are the subject of differences of view amongst executive and legislative officials. Some idea of their complexity may be gleaned from Chairman Herzog's statement to a Committee of the House of Representatives.[20a]

When the instant Grand Jury undertook to trench upon matters clearly within the purview of executive and legislative authority, it exceeded its authority.

It may be urged that even if the Grand Jury, qua Grand Jury, exceeded its powers, nonetheless, the issuance of the report may be viewed as the joint action of the jurors considered in their individual capacities. Even were we to make this strained assumption of individual and unofficial action, the short answer is that disclosure of matters occurring before the Grand Jury is prohibited by Rule 6(e) of the Federal Rules of Criminal Procedure.

Historically, the Grand Jury has always been bound by the oath of secrecy as to matters which it considered.[21] This ancient oath is implemented by Rule 6(e), which provides:

"Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter or stenographer may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment be-

---

19. Application of Texas Co., D.C., 27 F. Supp. 847, 849–850.

20. Testimony on February 24, 1953, before the Committee on Education and Labor.

20a. See footnote 20, supra.

21. I Holdsworth, A History of English Law 322.

cause of matters occurring before the grand jury."

Thus, the reach of the rule is emphasized by its injunction of secrecy upon government attorneys, court stenographers and interpreters, as well as jurors. And in this case it has special significance in view of the charge as to the source of the disclosure of the thirteen names.

The purposes of the oath and of the secrecy rule are manifold.[22] But in the context of this case the paramount purpose is the protection of those who are under investigation from irreparable damage if no indictment is found; conversely, if an indictment is returned, from possible prejudice upon the trial.[23] Protection of those against whom the prosecution cannot in ex parte proceedings make out a sufficient case to warrant indictment is defeated when the fact of suspicion and the proceedings had thereon before the Grand Jury are given wide-spread publicity in a report.

The report in this case described generally what transpired before the Grand Jury. Upon its filing it became a matter of public record.[24] This disclosure of matters presented to, and considered by, the Grand Jury, violated Rule 6(e). The sworn duty of the Grand Jury, if it found that the Federal conspiracy or perjury laws had been violated, was to indict—and not to issue statements if the evidence was insufficient to return an indictment. The Jurors were without power publicly to censure those who had been under investigation but whose acts did not warrant the finding of a true bill. In issuing the report based on evidence taken before them as an official body, they offended the rule of secrecy and the sanctity of their oaths.

The report is subject to another objection—implied before. This has to do with the nature of the report. As I have noted, it condemned, but did not indict, thirteen union officials. I do not believe that it is within the power of a Grand Jury to make accusations against individuals falling short of indictment. This view is supported by the State authorities in jurisdictions both where the Grand Jury is of statutory creation and where its powers are determined by looking at the "common law." [25]

The great weight of authority is that such reports exceed the power of the Grand Jury and may be expunged.[26] Special cases have arisen in which relief was

22. See United States v. Amazon Industrial Chemical Corp., D.C., 55 F.2d 254, 261; United States v. Smyth, D.C., 104 F.Supp. 283, 289, 303–4.

23. See Charge to the Grand Jury, 12 F.R. D. 495, 497.

24. In the absence of any issue being raised, this Court received the "presentment," and subsequently, upon the ex parte application of the United States Attorney based upon the request of the NLRB, authorized the forwarding of the thirteen names to the Board. Since it is now doubtful that such disclosure was made "preliminarily to or in connection with a judicial proceeding," the order so entered is open to question. The present proceeding is analogous to an application to vacate a default judgment.

25. It should be noted that when the courts have said that the power of the Federal grand jury is co-extensive with the powers of the grand jury at common law, they were discussing the power of the grand jury to investigate the commission of crime and to take all necessary steps to bring about the indictment of persons accused of the offense. E.g., Blair v. United States, 250 U.S. 273, 278–282, 39 S.Ct. 468, 63 L.Ed. 979; Beavers v. Henkel, 194 U.S. 73, 84, 24 S. Ct. 605, 48 L.Ed. 882; Hale v. Henkel, 201 U.S. 43, 59–66, 26 S.Ct. 370, 50 L. Ed. 652; United States v. Johnson, 319 U.S. 503, 510–513, 63 S.Ct. 1233, 87 L. Ed. 1546; United States v. Warren, D. C., 26 F.Supp. 333, 334; United States v. Smyth, D.C., 104 F.Supp. 283, 290. They were not considering the question with which we are here concerned—to wit, the power to issue a report where no indictment was returned.

26. Ex parte Robinson, 231 Ala. 503, 165 So. 582; In re Report of Grand Jury of Baltimore City, 152 Md. 616, 137 A. 370; Bennett v. Kalamazoo Circuit Judge, 183 Mich. 200, 150 N.W. 141; State ex rel. Strong v. District Court of Ramsey County, 216 Minn. 345, 12 N.W.2d 776; In re Funston, 133 Misc. 620, 233 N.Y.S. 81; State v. Bramlett, 166 S.C. 323, 164 S.E. 873; In re Grand Jury

withheld, as where the complainant was the person who instigated the investigation out of which the report came.[27] And there are some rulings that the matter is within the discretion of the lower court.[28]

The New York decisions are particularly pertinent because of the attention which has been devoted to the subject of condemnatory reports and because of the statute specifically authorizing Grand Juries to investigate officials for wilful misconduct in office and the condition of prisons.[29] With the exception of Matter of Jones[30] and dictum in In re Healy,[31] the New York courts have been highly critical of the practice whether the reports related to public officials or private citizens.[32] Even in the Healy case the Court held in no uncertain terms that although the rule may be different as to public officials, there was no power to issue reports against *private individuals*. And in the Jones case the holding was based on the premise that since the Grand Jury was given power by statute to investigate into misconduct by public officers, it must have contemplated reports thereon, even though no indictment was returned. It is not without significance, however, that the majority in the Jones case stated:

"* * * [I]f under the guise of a presentment, the grand jury simply ac-

cuse, thereby compelling the accused to stand mute, where the presentment would warrant indictment so that the accused might answer, the presentment may be expunged; * * *." 92 N. Y.S. at page 277.

Later decisions have not followed the Jones case, preferring its strong and well-reasoned dissent. They have denied the power of the Grand Jury to issue reports, referring either to public officials or to private individuals, whether by name or innuendo.[33]

While the courts have given special reasons, varying with the jurisdiction, for expunging reports of a specific nature, the main ground relied upon by all is one of policy. Broadly stated, that ground is that a man should not be subject to a quasi-official accusation of misconduct which he cannot answer in an authoritative forum. The Grand Jury, it is thought, when it issues such reports, is imposing the punishment of public reprimand—a punishment based upon ex parte proceedings which have not yielded enough evidence to warrant indictment. When it does this it defeats the very purpose of its existence. While the State courts have, for the most part, countenanced general reports which do not single out individuals,[34] they have uniformly condemned specific censure by

Report, 204 Wis. 409, 235 N.W. 789; In re Presentment to Superior Court, 14 N.J.Super. 542, 82 A.2d 496; cf. Coons v. State, 191 Ind. 580, 134 N.E. 194, 20 A.L.R. 900; State ex rel. De Armas v. Platt, 193 La. 928, 192 So. 659. For cases holding that such reports may be the subject of libel actions, see Rector v. Smith, 11 Iowa 302; Rich v. Eason, Tex.Civ.App., 180 S.W. 303; Poston v. Washington, A. & Mt. V. R. Co., 36 App.D.C. 359, 32 L.R.A.,N.S., 785; Bennett v. Stockwell, 197 Mich. 50, 163 N. W. 482, L.R.A.1917F, 761. Contra: O'Regan v. Schermerhorn, 50 A.2d 10, 25 N.J.Misc. 1; Irwin v. Murphy, 129 Cal.App. 713, 19 P.2d 292.

27. Application of Knight, 176 Misc. 635, 28 N.Y.S.2d 353; Hayslip v. State, Tenn.Sup., 249 S.W.2d 882.

28. Ex parte Cook, 199 Ark. 1187, 137 S. W.2d 248; State ex rel. Lashly v. Wurdeman, Mo.Sup., 187 S.W. 257.

29. New York Code of Criminal Procedure, § 260.

30. 101 App.Div. 55, 609, 92 N.Y.S. 275.

31. 161 Misc. 582, 293 N.Y.S. 584, 596–597. See also In re Crosby, 126 Misc. 250, 213 N.Y.S. 86, 88.

32. See, e.g., In re Wilcox, 153 Misc. 761, 276 N.Y.S. 117; In re Funston, 133 Misc. 620, 233 N.Y.S. 81; In re Woodbury, Sup., 155 N.Y.S. 851; In re Osborne, 68 Misc. 597, 125 N.Y.S. 313; In re Heffernan, Cty.Ct., 125 N.Y.S. 737; People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 367; In re Gardiner, 31 Misc. 364, 64 N.Y.S. 760, 762; Application of Bar Ass'n of Erie County, Cty.Ct., 47 N.Y.S.2d 213, 216.

33. See In re Wilcox, 153 Misc. 761, 276 N.Y.S. 117, 126.

34. See, e.g., Parsons v. Age-Herald Pub. Co., 181 Ala. 439, 61 So. 345, 348–349; In re Report of Grand Jury of Baltimore

the Grand Jury. And the commentators are in accord that such censure should not be permitted.[35]

A representative statement of the underlying reasons which have impelled the courts to denounce such reports appears in People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 367:

> "A presentment is a foul blow. It wins the importance of a judicial document; yet it lacks its principal attributes—the right to answer and to appeal. It accuses, but furnishes no forum for a denial. No one knows upon what evidence the findings are based. An indictment may be challenged—even defeated. The presentment is immune. It is like the 'hit and run' motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed."

As to the Federal cases, only one Supreme Court decision, In re Oliver, 333 U.S. 257, 264, 68 S.Ct. 499, 92 L.Ed. 682, has been discovered which refers to "reports." There, the Court was discussing Grand Juries generally. The power to issue reports and the question here posed was not before the Court. The policy grounds behind the decision in that case actually support the view that the October 1952 Grand Jury should not have issued the report here under attack. What concerned the Court in the Oliver case was the summary and secret nature of a trial for criminal contempt before Michigan's "one-man" judge-grand jury, which

amounted to a denial of due process. The damage ensuing from specific reports results, like the conviction in the Oliver case, from disregard of the traditional safeguards of an adversary proceeding and public hearing. Thus, if the Oliver decision is at all applicable, it would appear to support the view that specific reports should not be countenanced. Touching more closely on the subject, Mr. Justice Jackson had this to say about grand jury recommendations:

> "Complaint further is made that the courts below have been unduly influenced by recommendations of very high bail made by the grand jury. It is not the function of the grand jury to fix bail, and its volunteered advice is not governing. Since the grand jury is a secret body, ordinarily hearing no evidence but the prosecution's, attended by no counsel except the prosecuting attorneys, it is obvious that it is not in a position to make an impartial recommendation. Its suggestion may indicate that those who have heard the evidence for the prosecution regard it as strongly indicative that the accused may be guilty of the crime charged. It could not mean more than that without hearing the defense, and it adds nothing to the inference from the fact of indictment. Such recommendations are better left unmade, and if made should be given no weight."[36]

In the only Federal case which research by court or counsel has disclosed discussing this precise issue, the court stated that specific reports were beyond the power of the Grand Jury to issue.[37] And from the charge

City, 152 Md. 616, 137 A. 370, 373; Howard v. State, 60 Ga.App. 229, 4 S. E.2d 418, 423; In re Osborne, 68 Misc. 597, 125 N.Y.S. 313, 318.

35. See, e.g., Edwards, The Grand Jury 159; Konowitz, The Grand Jury as an Investigating Body of Public Officials, 10 St. John's L.Rev. 219, 225–227; Dession and Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L.J. 687; Lawyer, Should the Grand Jury System be Abolished, 15 Yale L.J. 178, 184; Medalie, Grand Jury Investigations, 7 Panel 5; 17 Boston Univ.L.Rev. 438,

441; 31 Minn.L.Rev. 500, 501; 27 N. Y.U.L.R. 319, 326–328. With specific reference to Federal grand juries, see Housel & Walser, Defending and Prosecuting Federal Criminal Cases, 256–257; Orfield, Criminal Procedure from Arrest to Appeal 146; 17 North Carolina L.Rev. 43, 50.

36. Stack v. Boyle, 342 U.S. 1, 9–10, 72 S.Ct. 1, 6, 96 L.Ed. 3 (concurring opinion).

37. In the Matter of the Report of the Grand Jury, 4 U.S.Dist.Ct. of Hawaii, 780.

of Judge Field in 1872 [38] to that of District Judge Goodman in 1952 [39] the emphasis of the Federal courts has always been upon the Grand Jury's power to indict for crime and upon its role of protector of the innocent.

The United States Attorney refers to the fact that reports in this district have been accepted through the years without protest. He points to some fourteen in number, filed in the past sixteen years. That they have been received without challenge does not import judicial sanction or authority in the Grand Jury to issue them. Whether individuals were named therein or whether they related to general conditions is not stated. The most that can be said is that they were not challenged and were permitted to go by default. [40]

We are not here concerned with reports of a general nature touching on conditions in the community. They may serve a valuable function and may not be amenable to challenge. But what the Grand Jury has done here is broadly to accuse the petitioners and others of false swearing; lacking enough evidence to indict, it has drawn and publicized inferences of guilt from the assertion by them of their constitutional privilege against self-incrimination.

The public, as well as petitioners, has an interest in the proper conduct of the Grand Jury—an interest the Court should protect. The public ought to be secure in the knowledge that one of its representative institutions does not exceed its powers and does not accuse without evidence sufficient to warrant indictment. And, finally, the public interest demands that the Court's processes be not used to defeat that fundamental fairness which must mark all judicial proceedings.

The wide-spread and unfavorable publicity attendant upon the filing of the report might well prejudice a prospective defendant's right to a fair trial—the right of every defendant, no matter what his alleged offense. [41] Upon the argument of the motion the Court was advised by government counsel that the matter was still under investigation and that the Grand Jury may yet return indictments against one or more who filed the affidavits under § 9(h)—a circumstance which makes it all the more difficult to understand why an interim "presentment" was issued.

In sum, constitutional considerations, the Federal Rules of Criminal Procedure, persuasive State authority, public and private interest, lead me to hold, as I do, that the issuance of the report in question was (1) beyond the power of the Grand Jury and (2) was in violation of the secrecy requirement. Accordingly, it should be expunged.

There is one other aspect of the Grand Jury proceedings which should not pass without comment. The minutes disclose that some of the witnesses, including one of the petitioners herein, were questioned as to religious matters by Jurors and the Special Assistant to the Attorney General. The scope of the inquiry extended to the witnesses' views on belief in a Supreme Being, baptism, their particular religious faith, the length of adherence to it, atheism and agnosticism.

When one witness protested that the inquiry infringed upon his right of conscience, the possibility of contempt proceedings was suggested.

█ The dubious explanation is now offered that this line of questioning was intended to determine whether the witnesses felt bound by the oath—whether they knew

38. In re Charge to the Grand Jury, 30 Fed. Cas.No.18,255.

39. Charge to the Grand Jury, 12 F.R.D. 495.

40. So distinguished a United States Attorney of this district as the late George Z. Medalie, who was a member of the Advisory Committee on the Federal Rules of Criminal Procedure, disputed the power of the grand jury even to issue general reports at common law. 7 Panel 5.

41. Cf. Delaney v. United States, 1 Cir., 199 F.2d 107, 114–115; United States v. Rosenberg, D.C., 108 F.Supp. 798, 803, 200 F.2d 666, 670; People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 365–367; People v. Frankel, 149 Misc. 195, 266 N.Y.S. 360.

the difference between swearing and affirming. The fact is, however, that the inquiry into the religious attitudes of the witnesses was not undertaken until long after they had been sworn and had testified at length. Such questions had no relevance to any subject within the purview of the Grand Jury. If the purpose was to ascertain whether the witness should be sworn or should affirm, the appropriate time to have made this determination was before the witness was sworn.[42] Whether the purpose was to determine the competency of the witness or to test his credibility, questions as to his religious views were entirely out of order.[43]

Questions as to religion may have a place in closed societies with official requirements as to religious belief, where conformity is the rule of life—such societies, in a word, as our forefathers fled from; but in a free society, such as ours, where a man's faith is his own affair, the questions asked were highly improper.

The motion is granted only to the extent of expunging the report. The remainder of the motion is denied since it is evident that the Jurors believed they were acting within the scope of their authority.

Settle order on notice.

---

**42.** It should be noted, too, that witnesses who were asked the significance of the oath swore that they considered themselves bound by it to tell the truth.

**43.** See 3 Wigmore, § 936 for discussion and criticism of admissibility of evidence on witness' religious belief for impeachment purposes. Also, cf. Brink v. Stratton, 176 N.Y. 150, 156–162, 68 N.E. 148, 63 L.R.A. 182, concurring opinion of Judge Cullen on this subject, joined in by four other judges.